O'BANNON *et al. v.* HENRICH.

(In Banc. Oct. 13, 1941. Suggestion of Error Overruled, Nov. 24, 1941).

[4 So. (2d) 208. No. 34618.]

J. Knox Huff, of Forest, P. P. Lindholm, of Lexington, and Barnett, Jones & Barnett, of Jackson, for appellants.

**Johnson & White**, of Lexington, and **J. G. Holmes**, of Yazoo City, for appellee.

Argued orally by **Ross R. Barnett** and **J. Knox Huff**, for appellant, and by **J. G. Holmes** and **H. H. Johnson,** for appellee.

**Smith, C. J.,** delivered the opinion of the court.

On April 1, 1939, O. O. O'Bannon, a bachelor, about thirty-seven years of age, executed a will, devising his property which did not exceed $25,000 in value, to his fiancee, Miss Julia Henrich. O'Bannon died on the 6th day of October, 1939, and the will was probated in common form on the 9th day thereof. O'Bannon was survived by six brothers, one sister and four children of a deceased brother, who, on December 1, 1939, contested the validity of this will by filing a petition in the court below under Section 1609 of the Code, alleging that: (1) At the time of the execution of the will, O'Bannon was mentally incapacitated therefor; and (2) "he was under undue influence with reference to the same to the extent that said alleged will is not the will of the reputed testator but that of another against his wish." Thereafter, a jury was empaneled to try the issue devisavit vel non presented by this petition. The proponent rested her case after proving that the will was duly probated. Whereupon, evidence was introduced by the contestants in support of their claim that the testator was without mental capacity to make the will, but they introduced no evidence whatever that any influence at all had been brought to bear on the testator in the making of the will except that two relations existed between the proponent and O'Bannon, which they say were confidential and from which an inference should be drawn that O'Bannon was unduly influenced by her in the making of the will. The issue of mental ca-

pacity was submitted to the jury, which decided against the contestants and in favor of the proponent, and we find no reversible error in the rulings of the court below on that issue. To respond to the appellants' contentions relative thereto would require the setting out of the evidence at length and a discussion of well-settled legal propositions, and consequently would serve no good purpose. The court below, by an instruction, excluded from the jury the consideration of the contestants' claim that the will was procured by undue influence on the testator.

The burden was on the proponent of proving the validity of this will, i. e., that the testator had the mental capacity to make it, and that he was not procured to make it by the pressure of undue influence on him. This burden she met by the introduction of evidence that the will "had been duly admitted to probate." Section 1611, Code of 1930. It then devolved on the contestants to introduce evidence in support of their two contentions affecting the validity of the will hereinbefore set forth. No evidence appears disclosing that O'Bannon was under any obligation, legal or otherwise, to devise his property to his brothers and sister, he therefore had the absolute right to devise his property to whomsoever he wished. The jury having found that he was of sound and disposing mind and memory, his will must be given effect unless it appears from the evidence that it does not express his real purpose and intent, but on the contrary that he was caused to make it by an influence exercised over him by another which virtually destroyed his free agency in the making of the will. The record is barren of any direct evidence that any influence whatever was exercised over him by anyone in this connection. No circumstances appear from which an inference of such influence can be drawn unless the relations between O'Bannon and the beneficiary in the will were of such a confidential nature that, when viewed in the light of the fact that without the will O'Bannon's property would have gone to his heirs-at-law, an inference that she unduly influenced him to

make it is justified. Two separate and distinct such relations are here claimed: (1) That of guardian and ward, or rather a relation so analogous thereto as to be governed here by the law thereof; and (2) that existing between a man and the woman whom he is engaged to marry.

In June, 1938, the testator had become so habituated to the use of intoxicating liquor that the chancery court appointed its clerk as the guardian of his estate, and P. C. Hemphill as the guardian of his person. Both of these guardianships were discharged by the chancellor on March 29, 1939. The beneficiary in this will, which was executed on April 1, 1939, was this chancery clerk's deputy on and several years prior to March 29, 1939, and continued thereafter so to be until this case was tried in the court below. Acting as guardian of the person or estate of an habitual drunkard is not one of the ex officio duties of a clerk of the chancery court but devolves upon him when but not unless he is appointed as such by a decree of that court, and therefore is not within the ex officio powers vested in a deputy chancery clerk by Section 747, Code of 1930, and there is no evidence that the beneficiary in this will did in fact perform any of the duties with which this guardianship charged the chancery clerk. The fact that she was the chancery clerk's deputy during the period this guardianship existed may therefore be dismissed from further consideration in this connection.

The testator and the beneficiary became affianced several years before the will was made and continued so to be until the testator's death. While they lived eighteen or twenty miles apart, the testator visited her frequently and their affection for each other clearly appears. No other relation between them of any character whatever than this is in any way remotely indicated by the record. Evidence disclosing a case where a man and woman are engaged to be married may also disclose that one of them has a dominating influence over the other, but this record is barren of any such evidence, and we are unwilling to hold that an inference may arise merely from the exist-

ence of the relationship itself that the woman has a dominating influence over the man. This court has never so held, and an examination of the few cases dealing therewith will disclose that the mere relationship itself does not justify the drawing of any such inference. If the evidence disclosed that this beneficiary actually participated in the preparation of this will, or if the character of the devise itself, under the circumstances confronting the testator, could be said to be unreasonable or unnatural, a different question might be presented, on which we express no opinion. As hereinbefore said, the testator was under no obligation to leave his property to his brothers and sister, and we are unable to perceive how it could be said that it was unreasonable for him to leave it to the woman he loved and expected to marry. The evidence as to the execution of this will is that on April 1, 1939, the testator carried it, typewritten and ready for his and the attesting witnesses' signatures, to the residence of the beneficiary's mother, with whom she lived, produced it in the presence of the beneficiary and several others, declared it to be his will, signed it and asked two of the persons present to attest it, which they did, all in the presence of each other. The will when produced by the testator bore a date prior to April 1st, which the beneficiary, in the presence of the testator and others, changed with a typewriter to April 1st. While the evidence does not directly disclose a request from the testator that the beneficiary make this change, it is manifest therefrom that it was made with his knowledge and approval.

There being nothing in the evidence that would have warranted the jury in finding that the testator was influenced in any degree by anyone in making the will, the court below committed no error in withdrawing that issue from its consideration.

Affirmed.

DISSENTING OPINION.

**McGehee, J.,** delivered a dissenting opinion.

After careful study and consideration of the evidence contained in the voluminous record in this case, I am fully persuaded that the jury should have been permitted to decide the issue as to whether the alleged will here in controversy was procured by undue influence; that the peremptory instruction should not have been granted in favor of the appellee in that behalf. A close personal and confidential relation was shown to have existed between Miss Henrich, the sole beneficiary thereof, and the testator. It is claimed on her behalf that they had been quite attentive to each other for a period of ten years. During that time she was a deputy in the office of the chancery clerk, where a guardianship for both the person and the estate of the testator had been pending for the period from June 2, 1938, to March 29, 1939, inclusive, before the alleged will was executed on April 1, 1939, the guardianship proceeding having been based upon an adjudication by the chancery court that the testator was incompetent to look after his business affairs on account of habitual drunkenness. At the end of the period aforesaid the guardianship was terminated by decree of the court, pursuant to a petition signed by the testator before Miss Henrich, the said deputy clerk, and which was not signed by the guardian, P. C. Hemphill, who was the bookkeeper in the office of the ward's place of business, and perhaps in better position than anyone else to know his condition. The petition was heard on proof taken before the Chancellor in vacation. The decree ordering the ward's property to be restored to him by the guardian was granted on the theory that the petitioner had sufficiently reformed his habits to be able to manage his own business affairs; but the proof in the case at bar discloses that he had been sentenced to pay a fine of $100 for driving while intoxicated in that same month, and that in the early morning of the day of the decree, restoring his prop-

erty to him, his barber detected the odor of whisky on his breath while shaving him; and that he got drunk in the late afternoon of that day following the hearing before the Chancellor in the premises.

It was also shown that it was after the testator had withstood the effects of the financial depression, and had accumulated an estate of real and personal property worth approximately $60,000 that he began drinking intoxicating liquors to such an extent that it became necessary to place him in an institution at Memphis, Tennessee, in 1937, where he remained for three or four weeks; that he then continued to drink until his relatives, at the instance of his friends and associates in the town of Pickens, where he lived, obtained the appointment of the guardian to take charge of his property and operate his business; and thereafter, in July, 1938, they obtained an order of the court committing him to the Veterans' Hospital at Gulfport, Mississippi, for treatment as a chronic alcoholic, where he remained for several weeks, with the result that his condition was temporarily improved.

After his return to the town of Pickens he continued to drink to such an extent that the maid who cleaned his room would find from one to three empty half pint whisky bottles every morning, in addition to two or three found by his employes at his place of business. It was further shown that his employes had to take him from the office to his home at about eleven in the forenoon, and about four or five in the afternoon, because of his being intoxicated. It was shown that this was the rule, the days on which he did not get drunk being the exception.

His physical and mental condition grew steadily worse during the year 1939, until his tragic death in October of that year, the result of his causing his bed to catch fire, fatally burning him.

In the meantime his estate had dwindled from a value of $60,000 at the end of the worst of the financial depression to approximately $18,000.

Aside from the expert testimony, showing the consequent weakening of will power and impairment of mental

faculties which necessarily resulted from such excessive and long-continued use of alcohol, it was abundantly shown by the testimony of lay witnesses, who testified to numerous instances, when he was drunk as well as when he was sober, that his acts showed such impairment. He would take money from the cash register without leaving a ticket to show by whom it had been taken—not because he was then drunk, but in order to purchase whisky and get drunk. But it is unnecessary for the purposes of this opinion to enumerate the many instances disclosed in the great volume of testimony, from which the jury would have been warranted in concluding that the mind of the testator had been greatly impaired by this excessive use of whisky, prior to the date of the will in question.

The observations above set forth are not made for the purpose of showing that the testator did not possess the necessary testamentary capacity to make a will, although the testimony would amply warrant such a conclusion, but rather for the purpose of showing that his mental faculties were so impaired as to entitle the jury to take such facts into consideration in determining the issue of whether or not there was undue influence exercised in the procurement of the will. It is obvious that he did not have sufficient will power to quit drinking alcoholic liquors, and that his will power was being further impaired by its use.

It is true that the proof discloses, on behalf of the proponent of the will, that on April 1, 1939, before the instrument was executed in the evening, in her home, making her the sole beneficiary, the testator displayed such mental capacity as to be able to go to a bank in Lexington and pay off a note, taking with him a check issued by his bookkeeper, obtaining the return of his collateral, together with the cancellation of the deed of trust, which he then delivered to the chancery clerk for recordation; and that later he returned to the bank and obtained a fire insurance policy which the bank had overlooked delivering to him at the time he paid the note. But it was also shown, on behalf of contestants, who are the heirs-at-law

of the testator, that he was accompanied on the occasion of the trip from Pickens to Lexington by an employe, Mr. Burrell, as shown by the testimony of such employe and the bookkeeper; and that on the trip back to Pickens that afternoon the testator bought some whisky, and was put to bed drunk between three-thirty and four o'clock that afternoon. While this employe was confused as to the time of this visit to the Bank of Lexington in relation to the date of the restoration to him of testator's property on March 29, 1939, nevertheless, he was positive that it was on the occasion of his trip to the bank to pay the note; and it was not shown that any other visit was made to the bank for such a purpose during the period in question.

This testimony in regard to his being put to bed on that afternoon is undisputed; and the fair import of the testimony of the experts introduced by the proponent is that it was *possible* that under such circumstances he could have been capable of making a valid will that evenning, it being shown that the will was executed shortly after six-thirty P. M. that day, while the testator was a dinner guest in the home of the beneficiary, along with the subscribing witnesses, one of whom had been attentive to the sister of the beneficiary for a period of fifteen years, and who testified at the trial in the court below that he had seen the testator at this home once or twice a week for several years, and that at all times prior to the execution of the will, and up to the time of the testator's death, his mental condition had been excellent, notwithstanding the proof as to the guardianship, the necessity for which had been conclusively established. The other subscribing witness testified that his mental condition had been perfect.

On the issue of undue influence the jury was entitled to take into consideration, in connection with the testator's impaired will power and mental faculties, the fact that the beneficiary, as deputy chancery clerk, was afforded an opportunity to become thoroughly familiar with

the formal requisites of a valid will, and the manner in which the same is required to be executed; and to consider this fact in connection with the circumstance that the heirs-at-law were unable to elicit any information from the subscribing witnesses or otherwise, as to where and by whom the instrument had been prepared—whether the testator was present at the time it was prepared, and other facts leading up to and attending its execution, together with the time, place, and unusual occasion selected for its signing and attestation. This instrument of writing, prepared on a typewriter, is shown to have been at first dated March 6, 1939, prior to the termination of the guardianship. The petition for the termination of the guardianship purports to have been signed by the testator, and sworn to before the beneficiary as deputy chancery clerk, on March 28, 1939, and his signature on such petition is obviously not in the same handwriting as the signature on the will, unless the total dissimilarity of the two signatures can be explained on the theory that he was drunk in one instance and sober in the other. It is shown that on the night the will was executed the beneficiary changed the date thereof on a typewriter at her home, before it was executed, so as to show the correct date of April 1, 1939, instead of March 6, 1939. The proof does not disclose at whose suggestion the change was made. One of the subscribing witnesses furnished the fountain pen, as he says, at the instance of the testator, and it was handed to him by the beneficiary.

In addition to all the circumstances above mentioned, the jury was entitled to consider the fact as to whether or not the will resulted in an unnatural disposition of the property of the testator, in view of the fact that the testimony fails to disclose that there had ever been any serious disagreement, if there had been one at all, between the testator and his heirs-at-law, such as to furnish a sufficient basis for a conclusion that his attitude was unfriendly toward them, since one of his sisters had manifested considerable interest in his welfare throughout his un-

fortunate experiences, frequently visiting him at his home, and sending to the café, there to be prepared, such things as she thought he would enjoy eating, to tempt his failing appetite; also, the further fact that the beneficiary in the will, together with one of the subscribing witnesses, later took the testator to Kosciusko, and requested this sister to send there for him, in order that he might spend a while in her home, to be cared for, a circumstance at variance with the contention made on their behalf that the testator had stated that none of his relatives cared anything about him, and for that reason he had left his property to the appellee.

In 28 R. C. L. 146, it is said: "When the person who drafts a will, or participates in procuring its provisions from the testator also occupies a relation of special confidence toward him, and would not be a beneficiary in the absence of the will, and is specially benefited by its terms, the general rule is that a presumption of undue influence will arise and the burden of proof will be on him to show that the will was executed fairly and without his influence."

In Curry v. Lucas, 181 Miss. 720, 180 So. 397, 398, this court said that: "From the very nature of the question, evidence showing undue influence must be largely circumstantial. Undue influence often is an intangible thing and is rarely susceptible of what might be termed direct and positive proof."

The court then cited the case of Jamison et al. v. Jamison et al., 96 Miss. 288, 51 So. 130, and quoted with approval from that decision the following: "The difficulty is also enhanced by the fact, universally recognized that he who seeks to use undue influence does so in privacy."

In the case of Ham v. Ham, 146 Miss. 161, 110 So. 583, 584, wherein Eugene Ham had obtained a deed from his brother and partner, C. M. Ham, the court said that the relation which existed between them was much more close and intimate than that which the law presumes from the mere fact of their being partners in business, and then

said: "We will treat the partnership simply as one of the evidences of the existence of a fiduciary relation between them in fact. The rules governing gifts, conveyances, etc., between parties to such a fiduciary relation are the same as those governing gifts, conveyances, etc., between parties occupying the conventional fiduciary relations, such as physician and patient, attorney and client, guardian and ward, trustee and cestui que trust." The court then quoted from 2 Pomeroy Equity Jurisprudence, (4 Ed.), section 956, as follows: "It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal, it may be moral, social, domestic, or merely personal." And the court further said: "The usual method of proving independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted on the advice of a competent person, disconnected from the grantee and devoted wholly to the grantor's interest. 2 Pomeroy Equity Jurisprudence (4 Ed.), secs. 958 and 960, and notes on pages 2040, 2041; 1 Black on Rescission and Cancellation, Sec. 40; Nobles v. Hutton, 7 Cal. App. 14, 93 P. 293; Spiva v. Boyd, 206 Ala. 536, 90 So. 289; Thomas v. Whitney, 186 Ill. 225, 57 N. E. [808], 810; Post v. Hagan, 71 N. J. Eq. 234, 65 A. 1026, 124 Am. St. Rep. 997; Soper v. Cisco, 85 N. J. Eq. 165, 95 A. 1016, Ann. Cas. 1918B, 452; Pironi v. Corrigan, 47 N. J. Eq. 135, 20 A. [218], 226; Hall v. Otterson, 52 N. J. Eq. 522, 28 A. [907], 910."

Therefore, I am of the opinion that the jury was entitled, under proper instructions, to apply these principles of law to the facts hereinbefore set forth, and to determine for itself whether or not the will in the case at bar was obtained by undue influence, or was the result of

independent consent and voluntary action on the part of the testator.

Another consideration that should be persuasive on the question as to whether the case should be reversed for a new trial, although it does not in itself constitute reversible error, is the fact that after the jurors had heard testimony during the excessive heat of the fifth day of the trial, they were subjected to the necessity of listening to four hours of argument that night, when it was foreseen at the beginning thereof that they would not receive the case for decision until about midnight, which would most likely result in a hastily considered verdict if they were to return to their homes for any rest and sleep, since it had already been determined that because of the lack of accommodations and the excessive heat they should not be required to undergo the ordeal of spending the night in the courthouse; for which reason they had theretofore been permitted to disperse each night throughout the trial. The result was that the verdict here appealed from, which found in favor of the proponent of the will on the issue of testamentary capacity, was rendered promptly by the jury after its retirement, and in all probability before they had had sufficient time to consider the many pages of instructions, the documentary evidence, and to have an exchange of views as to the proper conclusion to be reached on the testimony of the numerous witnesses in regard to the testator's lack of testamentary capacity to execute a valid will.

If the jurors had taken the time to examine, consider, and discuss the signature on the petition for the termination of the guardianship, and that whereby the testator joined in the guardian's final account, as subscribed before Miss Henrich as deputy clerk, in comparison with his signature as testator in the will, along with all of the testimony on the issue of testamentary capacity, as they probably would have done had the argument of the case been postponed until the next morning, a different verdict might have been reached.

From the foregoing and other considerations, unnecessary to discuss in detail, I am of the opinion that the judgment whereby the proponent of the will is awarded approximately $25,000 worth of property, including the life insurance of the testator, payable to his estate, and bequeathed to her under the will, but which policy he did not thereafter have changed so as to name her the beneficiary therein, should not be upheld as against his heirs-at-law until the case has been passed on by another jury, both on the issue of testamentary capacity and of undue influence.

**Anderson** and **Roberds, JJ.**, concur in this dissent.