I am unable to agree with the majority of the Court that Mrs. Moses should not be allowed to dispose of her property as she so clearly intended.
Since 1848 it has been the law of this state that every person twenty-one years of age, male or female, married or unmarried, being of sound and disposing mind, has the power by last will and testament or codicil in writing to dispose of all of his or her worldly possessions as he or she sees fit. § 657 Miss.Code 1942 Ann. (1956).
In 1848 the Legislature also said:
 "Whenever any last will and testament shall empower and direct the executor as to the sale of property, the payment of debts and legacies, and the management of the estate, the directions of the will shall be followed by the executor * * *." § 518 Miss.Code 1942 Ann. (1956). (Emphasis added).
The intent and purpose of the lawmakers was crystal clear: No matter what the form of the instrument, if it represented the free, voluntary and knowledgeable act of the testator or testatrix it was a good will, and the directions of the will should *Page 839 
be followed. We said in Gillis v. Smith, 114 Miss. 665, 75 So. 451 (1917):
 "`A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice.'" 114 Miss. at 677, 75 So. at 453. (Emphasis added).
Mrs. Fannie T. Moses was 54 years of age when she executed her last will and testament on May 26, 1964, leaving most of her considerable estate to Clarence H. Holland, her good friend, but a man fifteen years her junior. She had been married three times, and each of these marriages was dissolved by the death of her husband. Holland's friendship with Mrs. Moses dated back to the days of her second husband, Robert L. Dickson. He was also a friend of her third husband, Walter Moses.
She was the active manager of commercial property in the heart of Jackson, four apartment buildings containing ten rental units, and a 480-acre farm until the day of her death. All of the witnesses conceded that she was a good businesswoman, maintaining and repairing her properties with promptness and dispatch, and paying her bills promptly so that she would get the cash discount. She was a strong personality and pursued her own course, even though her manner of living did at times embarrass her sisters and estranged her from them.
The chancellor found that she was of sound and disposing mind and memory on May 26, 1964, when she executed her last will and testament, and I think he was correct in this finding.
The chancellor found that there was a confidential relationship between Mrs. Moses and Holland, who had acted as her attorney in the past, and who was, in addition, a close and intimate friend, and that because of this relationship and some suspicious circumstances a presumption of undue influence arose.
In Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959), this Court said:
 "57 Am.Jur., Wills, Secs. 389, 390, state that, although the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary exercised undue influence over the testator, as it does with gifts inter vivos, such consequence follows where the beneficiary `has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;' or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit. * * *" 237 Miss. at 723-724, 115 So.2d at 686. (Emphasis added).
There is no proof in this voluminous record that Holland ever did or said anything to Mrs. Moses about devising her property to anybody, much less him. It is conceded that in the absence of the presumption of undue influence that there is no basis to support a finding that Holland exercised undue influence over Mrs. Moses. This being true, the first question to be decided is whether the presumption of undue influence arises under the circumstances of this case.
It is my opinion that the presumption did not arise. The fact, alone, that a confidential relationship existed between Holland and Mrs. Moses is not sufficient to give rise to the presumption of undue influence in a will case. We said in Croft, supra:
 "[S]uch consequence follows where the beneficiary `has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;' or where the beneficiary in the confidential relation *Page 840 was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit." 237 Miss. at 723-724, 115 So.2d at 686. (Emphasis added).
It was not contended in this case that Holland was in any way actively concerned with the preparation or execution of the will. Appellees rely solely upon the finding of the chancellor that there were suspicious circumstances. However, the suspicious circumstances listed by the chancellor in his opinion had nothing whatsoever to do with the preparation or execution of the will. These were remote antecedent circumstances having to do with the meretricious relationship of the parties, and the fact that at times Mrs. Moses drank to excess and could be termed an alcoholic, but there is no proof in this long record that her use of alcohol affected her will power or her ability to look after her extensive real estate holdings. It is common knowledge that many persons who could be termed alcoholics, own, operate and manage large business enterprises with success. The fact that she chose to leave most of her property to the man she loved in preference to her sisters and brother is not such an unnatural disposition of her property as to render it invalid.
In O'Bannon v. Henrich, 191 Miss. 815, 4 So.2d 208 (1941) O.O. O'Bannon, a bachelor about thirty-seven years of age and an alcoholic, executed a will devising his property to his fiancee, Miss Julia Henrich. His six brothers, one sister and four children of a deceased brother contested the validity of this will, alleging that:
 "(1) At the time of the execution of the will, O'Bannon was mentally incapacitated therefor; and (2) `he was under undue influence with reference to the same to the extent that said alleged will is not the will of the reputed testator but that of another against his wish.'" 191 Miss. at 820, 4 So.2d at 208-209.
This Court said:
 "[N]o evidence appears disclosing that O'Bannon was under any obligation, legal or otherwise, to devise his property to his brothers and sister, he therefore had the absolute right to devise his property to whomsoever he wished. The jury having found that he was of sound and disposing mind and memory, his will must be given effect unless it appears from the evidence that it does not express his real purpose and intent, but on the contrary that he was caused to make it by an influence exercised over him by another which virtually destroyed his free agency in the making of the will. The record is barren of any direct evidence that any influence whatever was exercised over him by anyone in this connection. No circumstances appear from which an inference of such influence can be drawn unless the relations between O'Bannon and the beneficiary in the will were of such a confidential nature that, when viewed in the light of the fact that without the will O'Bannon's property would have gone to his heirs-at-law, an inference that she unduly influenced him to make it is justified. * * *
 * * * * * *
 "* * * If the evidence disclosed that this beneficiary actually participated in the preparation of this will, or if the character of the devise itself, under the circumstances confronting the testator, could be said to be unreasonable or unnatural, a different question might be presented, on which we express no opinion. As hereinbefore said, the testator was under no obligation to leave his property to his brothers and sister, and we are unable to perceive how it could be said that it was unreasonable for him to leave it to the woman he loved and expected to marry. * * *" 191 Miss. at 821-823, 4 So.2d at 209. (Emphasis added).
In this case, there were no suspicious circumstances surrounding the preparation or execution of the will, and in my *Page 841 
opinion the chancellor was wrong in so holding. However, even if it be conceded that the presumption of undue influence did arise, this presumption was overcome by clear and convincing evidence of good faith, full knowledge and independent consent and advice.
When she got ready to make her will she called Honorable Dan H. Shell for an appointment. Shell did not know her, although he remembered that he had handled a land transaction for her third husband, Walter Moses, some years before. Shell had been in the active practice of law in Jackson since 1945; he was an experienced attorney with a large and varied practice.
The chancellor hearing this case said of him in his written opinion:
 "Mr. Dan H. Shell is a highly reputable attorney. His integrity is unquestioned. This Court believes Mr. Shell's testimony, and finds that the circumstances surrounding the drawing of the instrument dated May 26, 1964, are exactly as he stated them from the witness stand. He testified that Mrs. Moses gave him the impression that she knew exactly what she was doing, and that there was no indication of outside influence. * * *" (Emphasis added).
She came alone to his office on March 31, 1964, and advised him that she wanted him to prepare a will for her. Mr. Shell testified that she was alert, intelligent and rational, and knew exactly what she was doing.
Mr. Shell was asked the question: "To what extent did you try to influence Mrs. Fannie Moses in drafting her will?" He answered:
 "I didn't try to influence her at all. I asked her about the property and I asked her marital background, because I needed to know whether or not there would be a spouse who might have renunciation rights, I needed to know if she had children and as to whether or not she wanted to pretermit them if there were children. I wanted to know the general value of the properties so that I could advise her as to whether or not she might have an estate tax problem, and I ascertained that she probably did have and so advised her, but she said that it didn't matter to her, that this was the way she wanted to leave the property, so I drew the will in accordance with her specific directions." (Emphasis added).
He advised her that he needed specific legal descriptions of her various properties. She got this information and brought it to his office. He prepared the first draft of the will and mailed it to her on May 1, 1964. Shell testified:
 "Then she called me in just a few days and pointed out that the will was not correct, that the property which I had described as being devised to Robert Miller was not the right tract of land and it should have been another piece of property that I had incorrectly devised to Clarence Holland and it should have been devised to Robert Miller, and the tract I had devised to Robert Miller should have been devised to Clarence Holland.
 "Well, of course, I wanted it as she wanted it,
so I immediately began to go about the revision. She sent in — I don't believe she came personally, or if she did she left with the receptionist some tax receipts which she thought would help me identify that property that I had misdescribed, and I did rewrite the will, and on May 21st I wrote her a short letter and sent her an original and two copies of the will as I had revised it. I did not see her when she came in later on May 26th or 27th — I don't remember what day it was — I was not in the office, I was in Court trying a case in Circuit Court, and I did not see her when she came in and actually signed the will, but I wrote the will on two separate occasions." (Emphasis added).
His testimony imports verity, and it stands uncontradicted. *Page 842 
The majority was indeed hard put to find fault with his actions on behalf of his client. It is easy for us who are removed from the active practice of law to criticize our brethren who are "on the firing line." The question is, did he do all that was reasonably required of him to represent his client in the preparation of her will. He was not required to be perfect, nor was he required to meet a standard of exact precision. He ascertained that Mrs. Moses was competent to make a will; he satisfied himself that she was acting of her own free will and accord, and that she was disposing of her property exactly as she wished and intended. No more is required.
On May 26, 1964, Mrs. Moses came alone to Mr. Shell's office. She told Mrs. Mary L. Ward, one of Shell's secretaries, that she had her will, that Mr. Shell had fixed it exactly as she wantedit, and that she was ready to sign it. She signed it in the presence of Mrs. Ward and Antoinette Neely, another secretary in Shell's law firm, and they each signed as an attesting witness. Mrs. Ward testified that Mrs. Moses was alert, friendly and her usual self on this occasion.
Shell was asked the direct question:
 "Q. Now in connection with the drawing of this will, what did Clarence Holland have to do with that?"
He answered:
 "A. Not one thing on earth."
Shell was asked:
 "Q. From that time up until the time of her death, did you ever discuss the matter with him?
 A. About his being a devisee under the will, or even writing a will?
 Q. Yes."
He answered:
 "A. No. That was none of his business, as far as I was concerned. It was confidential between Mrs. Moses and myself."
In the majority opinion there are extensive quotations from Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). Perhaps it would be well to place these in the context of the facts of that case.
John J. Alder, a widower who had no children, when he was about 87 years of age and while bedridden and a patient in the Coahoma County Hospital in Clarksdale, executed a will leaving 25 percent of his estate to Mary Ann Alder, his sister; 25 percent to his brother, Henry Alder; and 50 percent to his nephew, Barney L. Alder. This will was signed on March 18, 1957, and the testator died about eleven months later, on February 3, 1958.
The will of March 18, 1957, was probated in common form upon the affidavit of E.C. Black, one of the attesting witnesses. Black, an attorney, testified at the trial that the will wasprepared from data and information given him by Barney, theprincipal beneficiary. Barney told Black that John J. Alder, hisuncle, had requested him, Barney, to give this information toBlack, and, at the same time, Barney delivered to Black a copy of the 1955 will of his uncle.
The first time John J. Alder knew anything about the will was when Black read it to him in the hospital room in the presenceof Burdine and Barney. John J. Alder then signed it; Black and Burdine signed as attesting witnesses.
In Croft the Court was very careful to define and limit the suspicious circumstances that must exist, in addition to the confidential relationship, to even raise the presumption of undue influence. The specific examples listed were where the beneficiary actively participated in the preparation of the will, actually drafted it, or assisted in its execution. All of these carefully tabulated suspicious circumstances were present in theCroft case.
The facts in this case were entirely different. Mrs. Moses was 54 years old (Alder *Page 843 
was 87) when she executed her will. She went alone to the law office of an independent, capable and experienced attorney. Sheherself told him how she wanted to devise her property. This was on March 31, 1964. After she had pointed out an error in the first draft to Mr. Shell he corrected and rewrote the will and mailed it to her on May 21, 1964. She went alone to his office on May 26, 1964, and signed her last will in the presence of two disinterested witnesses. Almost two months had elapsed between her first conference with Shell and the actual execution of the will.
There is not one iota of testimony in this voluminous record that Clarence Holland even knew of this will, much less that he participated in the preparation or execution of it. The evidence is all to the contrary. The evidence is undisputed that she executed her last will after the fullest deliberation, with full knowledge of what she was doing, and with the independent consent and advice of an experienced and competent attorney whose sole purpose was to advise with her and prepare her will exactly as she wanted it.
In January 1967, about one month before her death and some two years and eight months after she had made her will, she called W.R. Patterson, an experienced, reliable and honorable attorney who was a friend of hers, and asked him to come by her home for a few minutes. Patterson testified:
 "She said, `Well, the reason I called you out here is that I've got an envelope here with all of my important papers in it, and that includes my last will and testament,' and says, `I would like to leave them with you if you've got a place to lock them up in your desk somewhere there in your office.'
 "* * * [A]nd she said, `Now, Dan Shell drew my will for me two or three years ago,' and she says, `It's exactly like I want it,' and says, `I had to go to his office two or three times to get it the way I wanted it, but this is the way I want it, and if anything happens to me I want you to take all these papers and give them to Dan,' and she says, `He'll know what to do with them.'" (Emphasis added).
What else could she have done? She met all the tests that this Court and other courts have carefully outlined and delineated. The majority opinion says that this still was not enough, that there were "suspicious circumstances" and "antecedent agencies", but even these were not connected in any shape, form or fashion with the preparation or execution of her will. They had to do with her love life and her drinking habits and propensities.
It would appear that the new procedure will be to fine-tooth comb all the events of a person's life and if, in the mind of the judge on the bench at that particular time, there are any "suspicious circumstances" or "antecedent agencies" in that person's life even though they are in nowise connected with the preparation or execution of that person's will, such last will and testament will be set aside and held for naught. With all time-honored tests out the window, the trial judge will be in the dangerous predicament of embarking on an unknown sea, without chart or compass.
If full knowledge, deliberate and voluntary action, and independent consent and advice have not been proved in this case, then they just cannot be proved. We should be bound by the uncontradicted testimony in the record; we should not go completely outside the record and guess, speculate and surmise as to what happened.
I think that the judgment of the lower court should be reversed and the last will and testament of Fannie T. Moses executed on May 26, 1964, admitted to probate in solemn form.
BRADY, PATTERSON and INZER, JJ., join in this dissent. *Page 844