GRIFFIS, J.,
for the Court.
¶1. On September 18, 2007, the Chancery Court of Calhoun County, Mississippi entered an order finding that Robert Wayne Hall (“Hall”) deceased, had the requisite mental capacity when he executed his Durable Power of Attorney and his Last Will and Testament, and that any *510 presumption of undue influence in the execution of either Hall’s power of attorney or Hall’s will was rebutted by clear and convincing evidence. Alice Mitchell (“Mitchell”), who had contested the validity of the will and power of attorney executed by Hall, has now appealed that decision, identifying two assignments of error, which we state verbatim: (1) the trial court erred by not finding a lack of testamentary capacity at the time of execution of the will, as well as a failure to properly follow established procedures for the execution to be valid; and (2) the trial court correctly found a confidential relationship between Hall and David Poynor (“David”), but it erred when it ruled that this confidential relationship was overcome by clear and convincing evidence. We find no error and affirm.
FACTS
¶ 2. Hall died on May 5, 2003. He was survived by a full-blood sister, Mitchell; a half-blood sister;[1] and two nephews, Joe and John David Mitchell. Hall was divorced and had no children.
¶ 3. In March 2001, Hall, a river boat engineer, became ill aboard a river boat, and he was admitted to Natchez Regional Medical Center. Upon admission, Hall was diagnosed with small cell lung cancer with metastases to the right frontal brain and supraclavicular lymph node area. After he was released from the hospital in April 2001, Hall moved to Eupora, Mississippi, where he resided in a house on Mitchell’s property. For the next four months, Hall lived in Eupora and received radiation and chemotherapy treatment at the North Mississippi Medical Center in Tupelo, Mississippi.
¶4. Mitchell testified that in August 2001, Hall moved to Big Creek, Mississippi to be closer to some of his friends and hunting buddies. In Big Creek, Hall requested the assistance of David, a longtime friend, to find a place to live. Hall was unable to find a place available in close proximity to David. As a result, David invited Hall to build a house or put a trader on his property. Hall purchased a trailer and moved onto David’s property.
¶ 5. Between August 2001 and December 2002, Hall continued to receive radiation and chemotherapy at North Mississippi Medical Center in Tupelo, during which time his cancer went into remission. When Hall traveled to Tupelo for treatments or other medical appointments, he was frequently accompanied by Melissa Poynor (“Melissa”), David’s wife.
¶ 6. On January 9, 2003, Hall was admitted to the hospital in Tupelo, where it was determined that his brain cancer had returned. In an effort to provide Hall some relief from the severe headaches associated with his illness, and possibly prolong his life, he was scheduled to undergo a craniotomy on January 16, 2003. Hall’s physicians informed him that there were significant risks associated with this type of surgery and advised him to get his affairs in order.
¶ 7. David testified that on January 10, 2003, Hall instructed him to contact the law office of Terry James (“James”) to obtain a power of attorney. David testified that he went to James’s office that afternoon and spoke with Charles Brown (“Brown”), James’s paralegal. Brown testified that David and his daughter, Christy Poynor Collum (“Christy”), arrived at the office just prior to closing. Because he knew David, Brown let them into the office. Brown testified that David explained that a power of attorney was required by a friend of his who had been told by physicians to execute a power of attorney quick *511 ly. Brown immediately prepared a durable power of attorney using a form from the office computer. He gave the power of attorney to David and explained the necessary steps for its execution. The durable power of attorney empowered David to make healthcare decisions for Hall should he be unable to do so and to conduct Hall’s business affairs.
¶ 8. David and Christy went to the hospital where Hall executed the power of attorney, which was then notarized by Christy. This power of attorney was filed with the Calhoun County Chancery Clerk and copies were provided to the hospital and BancorpSouth in Houston, Mississippi. Although Christy testified that she read the durable power of attorney to Hall, her testimony conflicts with David’s as to whether or not Hall read the power of attorney or whether it was read to him. Nevertheless, Christy stated that she notarized the power of attorney outside of David’s presence.
¶ 9. On the morning of January 13, 2003, David returned to James’s law office and told Brown that Hall was scheduled to have surgery within two to three days, and Hall needed to execute a will quickly. Brown testified that he or James had to talk with Hall about the contents of the will, and because James was not feeling well that day, Brown went with David to visit Hall in the hospital. That evening, after work hours, David drove Brown to Tupelo. Brown testified that he interviewed Hall about the will outside of David’s presence. Brown stated that the following day, he discussed his notes from the interview with James, created a draft of the will, and gave the draft to James to review. According to Brown, later that day when David came to the office to pick up the will, he gave David instructions on how to execute the will. David testified that later that evening he, Melissa, and his in-laws drove to Tupelo to have Hall sign the will. Gwendolyn Pannell Gibson and LaDonna Miller McCarley, who were nurses who had assisted in Hall’s care, testified that they witnessed Hall execute the will. However, neither of them knew if Hall read the will, had it read to him, or had it discussed with him. Mitchell testified that Hall was on medication that would have had some impact on his ability to read or understand the provisions of the will.
¶ 10. Hall underwent surgery on January 16, 2003, and was subsequently discharged from the hospital on January 24, 2003. Medical records indicate that Hall was discharged home to be cared for by the Poynors.
¶ 11. On April 21, 2003, during a followup visit to the oncologist, Hall was informed that the tumor had returned. Melissa testified that although the doctors offered Hall some medical options, he refused to undergo any additional treatment or surgery. David testified that on April 23, 2003, on Hall’s instruction he used the power of attorney to transfer $35,000 from a joint checking account, which Hall had with Mitchell at BancorpSouth in Houston to a separate checking account bearing Hall’s, David’s, and Melissa’s names. David testified that Hall instructed that David and Melissa were to use these funds to pay any expenses and outstanding debts which Hall incurred during his illness and to retain the balance for their personal use. Hall died on May 5, 2003. David and Melissa paid Hall’s funeral expenses of approximately $6,000, and they retained the balance of approximately $29,000 as a gift.
¶ 12. On June 24, 2003, Mitchell filed a petition styled as Petition for Grant of Letters of Administration, Appointment of Administratix, and other Relief and Caveat to Last Will and Testament of Robert Wayne Hall Prior to Filing for Probate, *512 and Complaint for Determination of Ownership of Assets in Joint Bank Account and Recruitment of Assets until Ownership Adjudicated in the Calhoun County Chancery Court. The Calhoun County Chancery Court granted letters of administration to Mitchell on June 24, 2003. On June 25, 2003, David filed a petition to probate Hall’s last will and testament and for letters testamentary with the Chancery Court of Calhoun County and a motion to revoke Mitchell’s letters of administration. On June 26, 2003, the chancellor ordered the letters of administration granted to Mitchell suspended and all of Hall’s assets frozen.
¶ 13. On September 5, 2003, at the request of Mitehell, the chancellor set a hearing to determine whether Mitchell as administratrix of Hall’s estate or David as executor named in Hall’s will should manage the estate and protect its assets. The hearing was held on September 24, 2003. On December 4, 2003, the chancellor filed an order granting Mitchell authority to file notice of creditors; directing Hall’s life insurance policy in the amount of $8,000 be paid into the registry of the court and to be held until resolution of the estate; directing all assets of the estate especially those removed by David and Mitchell be frozen; directing the parties to work together to secure insurance on the mobile home; directing that neither of Hall’s vehicles be utilized or driven to prevent any wear or tear on the vehicles and because no insurance existed on the vehicles; and granting the parties the authority to access Hall’s medical records.
¶ 14. The chancellor heard the case on the merits on January 30 and 31, 2007. At the conclusion of the trial, the chancellor took the issues under advisement. On September 18, 2007, the chancellor ruled that the durable power of attorney and the will were valid. The chancellor opined that although a confidential relationship existed between Hall and David, David had overcome the presumption of undue influence by clear and convincing evidence. In addition, the chancellor ruled that David could retain the remaining portion of the $35,000 he had removed from Hall’s joint checking account with Mitchell. The chancellor further ruled that Mitchell could retain the remaining portion of the $6,500 she had removed from the joint checking account. Aggrieved, Mitchell timely filed a notice of appeal.
STANDARD OF REVIEW
¶ 15. “This Court will not disturb a chancellor’s findings of fact in a will contest unless the findings are clearly erroneous, manifestly wrong, or the chancellor applied an incorrect legal standard.” In re Estate of Thornton v. Thornton, 922 So.2d 850, 852(¶ 6) (Miss.Ct.App.2006). “Questions of law, however, are reviewed de novo.” Id.
ANALYSIS

I. Validity of the Will

¶ 16. Mitchell argues that the trial court erred in finding that Hall’s will was valid because Hall lacked the testamentary capacity to execute his will. Mitchell asserts that Hall’s illiteracy, his medical condition, the type and the amount of medication he was taking, all prohibited him from possessing the requisite mental capacity to execute the will on January 14, 2003. David offered medical records and the testimonies of Hall’s nurses, who witnessed him execute his will, to rebut Mitchell’s assertions.
¶ 17. In order to execute a will in Mississippi, a person must be over eighteen years of age and be of sound and disposing mind.[2] When there is a contest *513 as to the validity of a will, the proponents of a will bear the responsibility of establishing its validity. O’Bannon v. Henrich, 191 Miss. 815, 821, 4 So.2d 208, 209 (1941). “The proponents of the will meet their burden of proof by the offering and receipt of the •will into evidence and the record of probate.” In re Estate of Holmes v. Holmes-Price, 961 So.2d 674, 679(¶ 13) (Miss.2007). “The proponents make a pri-ma facie case solely on this proof.” Id. at 679-80. Once the proponents make a pri-ma facie case, “[t]he burden then shifts to the contestants to overcome the prima fa-cie ease, but the burden of proof remains with the proponents to show by a preponderance of evidence that the testator had capacity.” Id. at 680. “Testamentary capacity requires that the testator/testatrix have the ability to understand and appreciate the nature and effect of his/her act.” In re Will of Wasson; Gallaspy v. Gallaspy, 562 So.2d 74, 77 (Miss.1990). “Such capacity requires that the testator/testatrix recognize the natural objects of his/ her bounty and their relation to him/her and that they be able to determine what disposition they desire to make of their property.” Id. We test the capacity to make a valid will as of the date of the execution of the will. Id.
¶ 18. Hall was born on January 29, 1946. He was fifty-six years old on January 14, 2003, the day he executed his will. Nurses Gibson and McCarley testified that they witnessed Hall execute his will and signed affidavits acknowledging that Hall was over eighteen years of age and was of sound and disposing mind when he executed his will.
¶ 19. Gibson stated that Hall’s severe headaches could have prevented him from thinking coherently, and one of his medications, Keppra, could have made Hall a little drowsy. Gibson testified that on January 14, 2003, she conducted three four-hour intervals neurological check assessments (at 8:00 p.m.; 12:00 midnight; and 4:00 a.m.) after she came on duty at 7:00 p.m. The neurological check assessments consisted of making a determination of whether Hall could recall his name, the date, where he was, the time, the level of limb movement and body strength. Gibson testified that although she did not recall what time she witnessed Hall’s execution of the will, Hall’s assessments remained unchanged throughout the night. Gibson stated that according to Hall’s medical records, the assessments made around the time the will was executed indicated that Hall was awake, alert, oriented, lucid, and coherent in thought, memory, and speech. Gibson also stated that there was nothing in her observation that indicated that Hall was not lucid or incoherent when he signed the will.
¶ 20. Hall’s admission records indicated that he had no barriers to learning, and his preferred learning methods were both written and verbal instruction. Hall’s medical records indicated that around the time Hall would have executed the will, Hall verbalized that he was not in any *514 pain. Hall’s medical records also showed that whenever the hospital personnel had conducted a plan of care instruction, Hall had verbalized an understanding of his plan of care. MeCarley testified that she had no doubt that Hall was of sound and disposing mind when he executed the will.
¶ 21. The chancellor concluded that Hall’s will was valid. The chancellor held that “at all relevant times, the evidence unequivocally showed that Hall was awake, alert, oriented, and coherent in thought, memory, and speech.” This Court has previously held that “[t]he chancellor is the fact-finder and is charged with the obligation of resolving disputes between the parties and likewise is the sole arbiter of the credibility of the witnesses.” In re Estate of Volmer v. Volmer, 832 So.2d 615, 622(¶ 21) (Miss.Ct.App.2002). As the fact-finder, the chancellor determined that the nurses were credible witnesses. In this case, the chancellor held that “the proponent has shown by a preponderance of the evidence that [Hall] was of sound and disposing mind, i.e., possessing testamentary capacity, when he executed his will on January 14, 2003.” The chancellor opined that attempts to rebut the evidence included only vague testimony that Hall lacked testamentary capacity at the time the will was executed. The chancellor also stated that although Mitchell claims Hall was under the influence of strong medication at the time, the medical records revealed that Hall “was not taking any regularly prescribed pain medication; in fact, the overwhelming weight of the evidence at trial indicated that Hall was lucid, coherent and fully capable of understanding and appreciating the nature of his act.” We find that there was insufficient evidence in the record to support Mitchell’s claim of lack of testamentary capacity. Thus, the chancellor did not abuse his discretion in finding that Hall’s will was valid. Therefore, this issue is without merit.

II. Execution of the Will

¶ 22. While a party may be found to have the testamentary capacity to execute a will, if that will is found to be the product of undue influence, fostered by a confidential relationship, the will may still be found invalid. Estate of Lawler v. Weston, 451 So.2d 739, 743 (Miss.1984). Where it is found that a confidential relationship exists, the proponent of the will must overcome by clear and convincing evidence the presumption of undue influence. Id.
¶ 23. The chancellor held that a confidential relationship existed between Hall and David. The chancellor opined that aside from the parties not disputing that a confidential relationship existed, the following facts demonstrate the existence of a confidential relationship and create a presumption of undue influence: (1) the fact that Hall was taken care of by David and Melissa during his illness; (2) Hall maintained a close relationship with David for more than thirty-five years; (3) David and his family provided Hall transportation and food; (4) Hall shared a joint bank account with David and Melissa; and (5) Hall executed a durable power of attorney in favor of David.

A. Confidential Relationship

¶ 24. ‘Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of the mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.” Foster v. Ross, 804 So.2d 1018, 1022-23(¶ 15) (Miss.2002). “Stated otherwise, a confidential relationship exists when one has a dominant, overmastering influence over a person depen- *515 dant upon him.” Id. at 1023(¶ 15). The factors to be considered in making the determination of whether a confidential relationship existed between the testator and beneficiary are:
(1) whether one person has to be taken care of by others,
(2) whether one person maintains a close relationship with another,
(3) whether one person is provided transportation and has their [sic] medical care provided for by another,
(4) whether one person maintains joint accounts with another,
(5) whether one is physically or mentally weak,
(6) whether one is of advanced age or poor health, and
(7) whether there exists a power of attorney between the one and another.
Thornton, 922 So.2d at 852-53(¶ 7).
¶ 25. David testified that he was aware that Hall had brain and lung cancer when he moved to Big Creek. David stated that he had promised Hall that he and his family would assist Hall in any way. David, Melissa, Christy, and Helen Lowri-more, a long-time family friend of the Poy-nor family, all testified that Hall often had breakfast and lunch in his mobile home, but Hall had dinner almost every night with the Poynor family. When Hall was not feeling well enough to join the Poynors in their home for dinner, a member of the Poynor family would take dinner to Hall. The witnesses testified that from August 2001, until his death, Hall spent all of his time, including all the holidays, with the Poynor family.
¶ 26. Melissa testified that she changed her work schedule to coincide with Hall’s medical appointments. Melissa also stated that she and Christy took Hall grocery shopping. However, Hall drove himself around town to pay his bills and to visit friends. Melissa testified that she cleaned Hall’s home and did his laundry the majority of the time especially when he became unable to do so. Christy testified that when Hall came home after the surgery, she cleaned and changed the dressings on Hall’s surgical incision. When Hall was no longer able to care for his personal needs, Melissa testified that she took greater responsibility in meeting Hall’s healthcare and personal needs.
¶ 27. David testified that after Hall was admitted to the hospital and told to get his affairs in order because of the seriousness of his impending surgery, he acted upon Hall’s instruction to contact James’s office to have a durable power of attorney and will drafted for Hall. David testified that he paid for the power of attorney and will and provided transportation for James’s paralegal, Brown, to the hospital in Tupelo to discuss the details of the will with Hall. David took the power of attorney and will to Hall to execute and then delivered the executed documents to the appropriate places.
¶ 28. In Hall’s medical records it was noted that upon Hall’s discharge from the hospital, Hall “would be discharged to home to the care of his friends, the Poynor family. He lives in a small home on the Poynor property and they check on him frequently.” The evidence established the existence of a confidential relationship between Hall and David.

B. Undue Influence

¶ 29. This Court has held that:
Where a confidential relation exists between a testator and a beneficiary under his will, and the beneficiary has been actively concerned in some way with the preparation or execution of it, the law raises a presumption that the beneficiary has exercised undue influence over *516 the testator, and casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence.
Thornton, 922 So.2d at 852(¶ 7). David is the beneficiary of all Hall’s property that was disposed of by will. David, Brown, and James all testified that David had a significant role in making certain that Hall had an executed will prior to undergoing major surgery.
¶ 30. The supreme court held in In re Will of Adams; Simm v. Adams, 529 So.2d 611, 615 (Miss.1988) that:
A presumption of undue influence is not raised merely because a beneficiary occupies a confidential relationship with the testator; something more is required, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator.... In other words, there must be some showing that the [beneficiary] abused the relationship either by asserting dominance over the testator or by substituting her intent for that of [the testator].
¶ 31. The supreme court also held that:
[U]ndue influence is the substitution of the will and intent of the beneficiary for that of the testator[.] The polestar consideration in [an appellate court’s] review of a will contest is to give effect to the intent of the testator. (When the intent of the testator has been ... ascertained, all minor, subordinate and technical rules of construction must yield to the paramount intent thus ascertained.) The effect of a charge of undue influence is to suggest that the will reflects the intent of the beneficiary and not of the testator. Undue influence in the matter of executing a will must be the substitution of another’s will for the will of the testator.
Gallaspy, 562 So.2d at 79 (internal citations and quotations omitted).
¶ 32. The evidence clearly supports a finding that David and his family were very supportive of Hall throughout his illness. Mitchell contends that although she was not accusing David of abusing his relationship with Hall, she found it suspicious that Hall made a will leaving his assets to David since Hall had previously told her that he was leaving everything to Mitchell and her sons.
¶ 33. To overcome this presumption of undue influence by clear and convincing evidence, the supreme court has looked to the following three-prong test:
1. The beneficiaries must have acted in good faith.
a. Who initiated the procurement of a will?
b. Where was the will executed and in whose presence?
e. What consideration was paid?
d. Who paid the consideration?
e. Was there secrecy or openness in the execution?
2. The testatrix must have had full knowledge and deliberation in the execution.
a. Was the testatrix aware of her total assets and their general value?
b. Did the testatrix understand who her natural inheritors were?
c. Did the testatrix understand how the change would legally effect prior wills?
d. Did the testatrix know that non-relative beneficiaries would be included?
e. Did the testatrix know who controlled her finances and by what method?
1. How dependent is the testatrix on those handling her finances?
*517 2. How susceptible is she to influence by those handling her finances?
3. The testatrix must have exhibited independent consent and action.
In re Will of Smith; Smith v. Averill, 722 So.2d 606, 612(¶ 22) (Miss.1998).
¶ 34. The first prong to be considered is whether David acted in good faith. David played a major role in the preparation of Hall’s will. David testified that he contacted James to obtain a durable power of attorney and a will for Hall only after doctors informed Hall of the seriousness of his pending surgery and that he needed to get his affairs in order. Brown testified that on January 13, 2003, David came to James’s office and stated that Hall needed to execute his will quickly because he (Hall) was undergoing life-threatening surgery within the next two or three days. That afternoon, David drove Brown to the hospital in Tupelo to interview Hall. Brown and David testified that during their trip to Tupelo, they did not discuss the provisions of Hall’s will. Brown testified that David was not present when he interviewed Hall. The following day, David picked up the will from the law office, was given instructions by Brown on how the will was to be executed, took the will to the hospital for Hall to execute, and returned the executed document to James’s law office. David testified that he paid one hundred dollars for both the durable power of attorney and the will. However, James testified that he does not recall the amount, and Brown testified that he does not recall David paying at all. Hall executed the will in his hospital room in the presence of David, Gibson, and McCarley.
¶ 35. Testimonies of several witnesses indicated that David was aware of Hall’s deteriorating health and that David and his family acted unselfishly to lend their support to Hall by taking Hall to medical appointments, grocery shopping, and providing Hall a place at their dinner table every night for nearly two years. Evidence revealed that when Hall asked David to assist him in getting his affairs in order, David secured the services of an attorney to have the will drafted and without hesitation paid to have the will drafted. David then took the will to Hall, and at Hall’s request, he found two witnesses to sign the will. Clearly, the record contains sufficient evidence from which the chancellor might conclude that David acted in good faith.
¶ 36. In considering whether Hall had full knowledge of his actions and their consequences, the Court considers the following:
(a) his awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.
Holmes-Price, 961 So.2d at 684(¶ 39).
¶ 37. The record indicated that Hall was aware of his assets. Brown testified that Hall stated he had no real property. The testimony of Martha Martin, the Calhoun County Chancery Clerk, substantiated this claim. Brown stated that Hall wanted his personal property, which consisted of a mobile home, two trucks, a bus, a boat, guns, dogs, and other items in his house to go to David. Brown stated that although Hall knew he was leaving David *518 his personal property, he had made sure that Mitchell was provided for through his life insurance policy. Brown also testified that when he asked about bank accounts, Hall made reference to a joint checking account with Mitchell at BancorpSouth in Houston. Brown stated that Hall was aware that the joint checking account was a survivorship account and that it was not necessary to place the account as a provision in the will. Brown testified that Hall stated he was not married and had no children. Brown also stated that Hall wanted David to take care of his affairs if he died and for Mitchell to be named as the alternate executrix.
¶ 38. Testimonies from Mitchell, Melissa, David, and Robert Harrison, a friend of Hall’s, suggested that Hall controlled his own finances. Melissa testified that she never saw Hall’s bank statements, and she never assisted Hall in paying his bills or writing checks. Harrison testified that Hall always came in to Harrison’s business to pay his own bills himself. Mitchell testified that when she made a special trip to visit Hall to discuss his finances, need for a will, and Hall’s funeral arrangements, Hall refused Mitchell’s offer of assistance. Lastly, bank records indicate that Hall’s bank statements went to a post office box that he owned in Big Creek and that he conducted his own banking up until April 23, 2003.
¶ 39. The last prong is whether Hall exhibited independent consent and action. Brown testified that he conferred with Hall and obtained the information for the will when only the two of them were present. Brown testified that he took notes and prepared the will consistent with the directions of Hall. Brown was not involved in the execution of the will. Indeed, there is nothing in the record which suggests that any independent party reviewed the completed will with Hall to be sure that it appropriately addressed his desires. The record indicated that David, the named executor and sole beneficiary of the will picked up the will from James’s office, took it to Hall to be executed, asked Gibson and McCarley to serve as witnesses, and then returned the executed will to James’s office.
¶ 40. Given the evidence, this Court may well have reached a different conclusion from that of the chancellor if it were considering the case in the first instance. However, the record would appear to contain sufficient credible evidence from which the chancellor could and did conclude that the presumption of undue influence was overcome regarding the will. Therefore, we find that this issue is without merit.

III. Inter Vivos Gift

¶ 41. Mitchell argues that the chancellor erred when he did not set aside the alleged inter vivos gift to David and Melissa in the amount of $35,000. Mitchell contends that David did not overcome the presumption of undue influence by clear and convincing evidence that the $35,000 David transferred from a joint checking account Hall had with Mitchell was an inter vivos gift from Hall to David and Melissa.
¶ 42. As discussed above, this Court may well have reached a different conclusion from that of the trial court if it were considering the case in the first instance. However, the record cited above contains sufficient credible evidence to support the chancellor’s decision.
¶ 43. We note that Hall had almost four months after his January surgery to cancel or modify his power of attorney or will. There was no testimony that during this time, he was not fully competent. Hall returned to his home and resumed his normal routine. Hall’s medical records *519 were clear that after his hospital stay ended on January 24, 2003, Hall was alert, lucid, coherent, and oriented to person, place, and time. The doctor’s notes indicated that there were no communication issues with Hall and that he understood the seriousness of his condition. Certainly, Hall could have terminated the power of attorney at any time after January 24th. The chancellor determined that it was reasonable to conclude that Hall was satisfied that he had properly settled his affairs.
¶44. David did not use the power of attorney to conduct business on behalf of Hall until April 23, 2003. On or about that date, David transferred $35,000 from Hall’s bank account on which Mitchell was listed, to a joint account in the names of Hall, David, and Melissa. This left a balance of approximately $6,500 in the account on which Mitchell was listed. David testified that he considered the $35,000 transfer to be solely Hall’s money until his death. David promptly paid Hall’s funeral expenses from those same monies.
¶ 45. Mitchell testified that her last visit to see Hall was about the same time as the transfer. She testified that she saw something from the bank reflecting the transfer while she was at Hall’s home. However, instead of asking Hall about it, she checked with the bank.
¶ 46. Before Hall’s death, on May 1, 2003, Mitchell withdrew $5,966.65 from the account, and a couple of days later wrote a check to “Cash” for $490. These transactions effectively closed the account. Mitchell testified that she made no inquiry regarding outstanding checks or drafts; she made no inquiry of Hall or David regarding the $35,000 transfer or her $6,456.65 withdrawal; she did not inform Hall of the withdrawal or attempt to make sure there were no outstanding drafts.
¶47. Thus, the chancellor had Mitchell’s testimony that she withdrew the $6,456.65 from her brother’s account without making inquiry or conferring with him, to compare with David’s testimony that he transferred the $35,000 to a joint account bearing David’s, Melissa’s and Hall’s names solely at the direction of Hall himself. David and Melissa testified that Hall wanted to make sure they had access to his money to help take care of him without having to spend their money. David further testified that Hall had specifically instructed him on the amount to transfer and the amount to leave remaining in the existing account, and Hall further instructed him to leave the account open. Clearly, the chancellor determined that David’s and Melissa’s testimonies were credible and trustworthy.
¶ 48. Charlie Brown, Bobby Harrison (“Bobby”), Jimmy Vance, and Chris Con-nelly testified about David’s reputation in the community for truth and veracity. Each of them testified that it was their opinion that David did not and would not take advantage of Hall. Bobby testified that Hall was lucid and fully competent each time he saw him, even following his January 16, 2003, surgery. Bobby also opined that Hall knew what he was doing and freely and voluntarily did what he wanted relative to the disposition of his worldly goods and property.
¶ 49. “When dealing with an inter vivos gift, we have held that a confidential relationship alone is sufficient to raise the presumption of undue influence.” Greenlee v. Mitchell, 607 So.2d 97, 105 (Miss. 1992). “[W]hen there is a fiduciary or confidential relation, and there is a gift or conveyance of dubious consideration from the subservient to the dominant party, it is presumed void.” Griffin v. Armana, 687 So.2d 1188, 1193 (Miss.1996). “This is not because it is certain the transaction was *520 unfair; to the contrary, it is because the Court cannot be certain it was fair.” Id.
¶ 50. To overcome the presumption of undue influence as it relates to the receipt of an inter vivos gift, and to avoid having the gift declared void, the recipient must offer clear and convincing evidence that the gift was the result of the free and independent determination of the giver. The evidence that is sufficient to overcome the presumption that the gift was the product of undue influence and, therefore, void must be something more than the self-serving testimony of the recipient. See In re Estate of Smith; Irving v. Streater, 827 So.2d 673, 683(¶ 4) (Miss. 2002).
¶ 51. The chancellor determined that all of the evidence considered together was sufficient to determine that Hall intended to make a cash inter vivos gift to Davis and Melissa. Based on the evidence presented, we may well have reached a different conclusion from that of the chancellor if we were considering the case in the first instance. However, the record would appear to contain sufficient credible evidence from which the chancellor could and did conclude that the presumption of undue influence was overcome regarding the inter vivos gift. Therefore, we find that this issue is without merit.
¶ 52. THE JUDGMENT OF THE CHANCERY COURT OF CALHOUN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., ISHEE, CARLTON and MAXWELL, JJ., CONCUR. KING, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J. AND BARNES, J. IRVING AND ROBERTS, J., NOT PARTICIPATING.

. The name of the sister is omitted since she is not a party in this matter.

. Mississippi Code Annotated section 91-5-1 (Rev.2004) provides: *513 Every person eighteen (18) years of age or older, being of sound and disposing mind, shall have power, by last will and testament, or codicil in writing, to devise all the estate, right, title and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, heredit-aments, or annuities, or rents charged upon or issuing out of them, or goods and chattels, and personal estate of any description whatever, provided such last will and testament, or codicil, be signed by the testator or testatrix, or by some other person in his or her presence and by his or her express direction. Moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix.