## MARTIN *v.* MARTIN'S ESTATE.

Apr. 6, 1953

No. 38715 26 Adv. S. 23 63 So. 2d 827

*Morse & Morse,* for appellant.

*Mize, Thompson & Mize,* for appellee.

ROBERDS, P. J.

Peter F. Martin departed this life July 25, 1951. He was a man of large means. He left a last will and testament, dated June 23, 1950, in which he named appellee Bank executor and trustee. Appellant, claiming to be his common law wife, undertook, by written instrument dated and filed December 27, 1951, to renounce that will and take half of his estate, as provided for by Section 668, Mississippi Code 1942. She also, by written instrument filed January 3, 1952, petitioned the chancery court to require the appraisers to set aside to her a year's allowance as the widow of Peter F. Martin. The Executor and Trustee denied her assertion that she was the common law wife of Martin and contested her right to renounce his will and her claim to a year's support out of his estate. The chancellor found that appellant was not the wife of Martin and denied her right to renounce his will and her claim to a year's support as his widow. She appeals. The main question for our decision on this appeal is whether we shall reverse the chancellor on that finding.

Counsel for appellant frankly states that the burden is upon appellant to show, by a preponderance of the evidence, (1) an agreement between the parties to become man and wife, (2) a holding out by them to the public that they bore that relation, (3) a common repute in the community where they resided that they were man and wife, and (4) that they cohabited as man and wife.

There are certain facts pertinent to this question which are undisputed.

Peter F. Martin and Theda Z. Arens were married in New Orleans, La., December 15, 1910. They lived together as man and wife until her death in Biloxi, Miss., their home, March 3, 1949. They had no children. They adopted a son, Peter F. Martin, Jr. They were very devoted to him. As some of the witnesses expressed it, they were "wrapped up in him." During the time involved in this litigation he was attending a military school for boys at Gainesville, Georgia, spending his vacations at the home of his parents in Biloxi. Mr. and Mrs. Martin were unusually affectionate and devoted to each other during their entire married life. They had resided in and about Biloxi for many years. Mr. Martin decided to construct a rather palatial home in Biloxi. Because of the physical condition of his wife he placed in that home an elevator for her use in going to and from the upstairs. There were three bedrooms upstairs—one each for himself, his wife and his son. Before completion of the home his wife died. That sad event upset Mr. Martin very much. He would often become very emotional when it was mentioned. Until his death he kept intact her room, containing her private and personal belongings. When he passed away he was buried beside her in a lot he had purchased years before for that purpose.

We will now take up the thread of events beginning with the death of Mrs. Martin, March 3, 1949.

In March, 1949, appellant was operating a liquor store in Slidell, La. In May, 1949, some kind of an arrangement was made between Mr. Martin and appellant. Appellee says she was engaged as a housekeeper. Appellant says it was to become common law man and wife. Appellant used twelve witnesses. We will briefly summarize the most pertinent parts of their testimony.

On the question of agreement, one witness said Mr. Martin was showing him about the new home and witness asked who was going to take care of it. Martin replied

he would give him three guesses. Witness said Mrs. Marie Moore. Witness suggested he and his wife be in the wedding. Martin replied, "You are a little late on that."

Another witness testified Martin told her that Mrs. Moore is "coming over here."

Another said she was present when Mrs. Moore came to the Martin home and was unpacking her personal belongings and arranging furniture in her room, and that Martin told her to place them where she desired—"that you will be the one that will have to look at it the rest of your life."

Another said he asked Martin if he and Mrs. Moore were married and Martin replied "It was a little secret."

As to the intimate relations, one said he had seen Martin pat her on the back; another that he kissed her on the cheek; another that he saw him put his arms around her.

Mr. Martin bought her a fur coat and gave her a Russian sable which had belonged to his wife. One witness said they occupied the same room one night when she was in the home. Two others said Mrs. Moore slept upstairs one night when they were at the home. Another said she saw Mrs. Moore in his room in her night clothes. It is shown that appellant supervised the meals and ran the house, and tried to keep Mr. Martin on his diet. Mr. Martin was 68 years of age, had diabetes and a bad heart. Mrs. Moore was about 58 years of age.

As to public acknowledgment by the parties of the marital relation, one witness for appellant said that on one occasion Mr. Martin introduced appellant as Mrs. Martin. She was somewhat uncertain about that. She said her husband was present and he testified he did not hear Martin so introduce her. The other witnesses for appellant, who testified about that fact, said they had never heard Martin introduce her as Mrs. Martin; that he always introduced and addressed her as Mrs. Moore.

As to the general repute in the community as to whether they were man and wife one witness for appellant, who resided in Louisiana, said she thought the public regarded them as man and wife, and another said people seemed to think they were married.

There was no proof whatever of cohabitation except as might be inferred from the foregoing testimony, or similar testimony, given by witnesses for appellant.

Mr. Martin provided a special account at the bank for paying the expenses of operating the home and Mrs. Moore drew checks on that account.

Twenty-six witnesses testified on behalf of the appellee. A number of these were local people, longtime friends, business associates of Mr. Martin, and some were public officials, including the mayor of Biloxi.

Some fifteen of them said the general repute in the community was that appellant was the housekeeper for Mr. Martin.

At least twenty said Mr. Martin always introduced and referred to her as Mrs. Moore, his housekeeper, and that appellant referred to herself as Mrs. Moore. Some said they had been to the home and were met by appellant, who said she was Mrs. Moore, the housekeeper. Mr. Martin said to one, when he introduced Mrs. Moore, "who we are anticipating to be my housekeeper"; to another he said, when so introducing her, the arrangement as housekeeper was to be tried out for one year. In fact, except for the statement of one witness that on some trip Mr. Martin introduced appellant as Mrs. Martin, all of the testimony is to the effect that Martin introduced appellant as, and always called her, Mrs. Moore, and the first time she ever called herself Mrs. Martin was when she undertook to renounce the will of Mr. Martin in this cause.

It is further shown that when appellant and Martin visited Pete, Jr., at school that they occupied separate rooms at the hotel. It is also shown, as stated, that the

home had three bedrooms upstairs—that of Mr. Martin, Pete, Jr., and his former wife—and one downstairs which was occupied by Mrs. Moore. Many witnesses testified they never saw any feminine clothing, or personal effects, in the room occupied by Mr. Martin. A number said appellant directed them through the home, pointed out her room downstairs and that of Mr. Martin upstairs, as well as that of Pete, Jr., and the room formerly occupied by Mrs. Martin, containing her personal effects, which was being kept intact by Mr. Martin.

Appellee introduced hundreds of written documents, such as checks on the household account, receipted bills, and various other documents, containing the signature of appellant. All of them were signed by her as Mrs. Moore. Not a one was signed by her as Mrs. Martin. These included her income tax reports for 1950 and 1951, in which she said she was an unmarried person. They included income tax reports of Mr. Martin, in which he said he was a single person and his only dependent was his son Peter, Jr. Certificate of the death of Mr. Martin was introduced, in which he was designated a "widower." That information was given the undertaker by appellant.

We have not undertaken to detail all of the testimony given by these thirty-eight witnesses nor that disclosed by the hundreds of written documents in this record. The record contains approximately eleven hundred pages. However, we have tried to accurately give enough of it, pro and con, to disclose the problem presented to the chancellor in the lower court. The last pronouncement of the law on common law marriages by this Court appears to be contained in the opinion in Ridley v. Compton (Miss.), 10 Adv. S. 30, 61 So. 2d 341 (December 1, 1952). It was there said:

"The matrimonial relation may be created by consent of parties, per verba de presenti, followed by cohabitation thereunder, and its existence may be shown by the acts and declarations of the parties. Floyd, Executor

v. Calvert, 53 Miss. 37. But a claim of common law marriage is regarded with suspicion and will be closely scrutinized, and in order to establish a common law marriage, all the essential elements of such a relationship must be shown to exist. 55 C. J. S., Marriage, Sec. 45 b, p. 911; U. S. Fidelity & Guaranty Co. v. Smith, 211 Miss. 573, 52 So. 2d 351.

██ █ '' 'The word "cohabitation" as used in the marriage laws means the public assumption by a man and a woman of the marital relation, and dwelling together as such, thereby holding themselves out to the public as being man and wife.' Hunt v. Hunt, 172 Miss. 732, 161 So. 119, 121. And, as stated by the Court in the case of Bartin v. State, 165 Miss. 355, 143 So. 861, ██ █ 'It is, of course, among the essentials of a valid common-law marriage that both parties must intend in good faith to live together in the relation of husband and wife, and that the union shall be permanent and exclusive of all others. 38 C. J. 1317, 1318. The agreement between the parties must be unequivocal and free from any reservations, mental or otherwise, to the full extent that, when consummated by cohabitation, nothing less than a decree of divorce pronounced by a court of competent jurisdiction can dissolve the relation.' ''

This Court has said many times we will not reverse a finding of fact by the chancellor unless such finding is against the great weight of the evidence, or, stated differently, ██ █ "Upon disputed questions of fact, the chancellor's findings will be accepted when they are substantially supported by the evidence and reasonable inferences from it." Sandifer v. Sandifer (Miss.), 8 Adv. S. 23, 61 So. 2d 144. We certainly cannot say in this case that there is not substantial evidence to support the finding of the chancellor. On the other hand, we think his finding is supported by the great preponderance and weight of the testimony.

Mrs. Florence Shuler, who resided in Slidell, La., a witness for appellant, testified that she was informed by someone employed in the "liquor establishment" of appellant, that Mr. Martin had been there inquiring for appellant, who was at the time in New Orleans; that later appellant called Martin over the telephone from her house, and that she heard appellant say "No, Pete, I can't come right away, well I told you I can't make it— Yes, honey, yes, honey" and "No, honey. As soon as I can I will come over." The quoted part of the testimony of this witness was excluded. Appellant says that was reversible error. It is argued these expressions were a part of the res gestae. We do not quite see the application of that argument. ■■ However, the witness said she did not know to whom appellant was talking. She, of course, did not know what the other party was saying. ■■ In such circumstances the declarations were purely self-serving and, as such, incompetent. "A party cannot testify for himself out of court." Bullard v. Citizens National Bank of Meridian, 177 Miss. 735, 171 So. 540. Again, apparently this was before Mr. Martin had ever conferred with appellant, and it could have had, if admitted, but little bearing upon whether the final arrangement between them was that of a common law marriage or for appellant's services as a housekeeper. Certainly, it was not of sufficient importance as to work a reversal of this cause.

■■ Appellant says the will of Martin could not be taken into consideration; that to do so was error. The will imposed upon the trustee the duty "To pay to Mrs. Marie Elizabeth Moore each month so long as she lives and remains unmarried, but no longer * * * " such sum as in the sole discretion of the trustee would provide for "her livelihood and comfort according to her present station in life * * *." That provision might be construed as some evidence in support of the contention of appellant. On the other hand, the fact that the testator,

at a time when appellant claims to have been married to him, designated her as "Mrs. Marie Elizabeth Moore" and not as Mrs. Martin, was against her contention. But we cannot see the force of the objection to the chancellor considering the will when that is the very instrument appellant undertook to renounce. The will had to be taken into consideration.

Appellee introduced the income tax report made by appellant for the years 1950 and 1951, during which time she claims she was the common law wife of Martin. In those returns she designated herself as "Mrs. Marie Moore," and said she had no husband. Appellant contended at the trial that this was a waiver by appellee of the provisions of Section 1690, Mississippi Code 1942, prohibiting a person from testifying as a witness to establish his own claim or defense against the estate of a deceased person which originated during the lifetime of such person. Appellant then offered herself as a witness to establish her claim that she was the common law wife of Martin, and the chancellor sustained an objection to her testifying for that purpose. Appellant says that was reversible error. She cites Waldauer v. Parks, et al., 141 Miss. 617, 106 So. 881, and Fant v. Fant, 173 Miss. 472, 162 So. 159. But those cases do not sustain appellant's contention. In the first case Parks, claimant against the estate of Waldauer, deceased, was placed upon the stand by Mrs. Waldauer, widow of decedent, through whom she came to her right, and Parks was examined about the subject matter of the litigation. The Court held that action waived the incompetency of Parks as a witness. The Fant case involved only the force and effect of sworn answers by two grantees in deeds executed to them by Helen Fant in her lifetime, the suit being by the heirs of Helen Fant, deceased, to set aside the deeds, the bill not waiving answer under oath. The question involved the construction of Section 383, Code of 1930, abolishing, under named circumstances, the rule requiring two wit-

nesses, or one witness and corroborating circumstances, to overthrow a sworn answer denying the allegations of the bill, as applied to the state of pleadings in the Fant case. It is evident at once that neither case has any application here. Neither party cites an authority deciding this question. However, in reason it could not be the rule that when a litigant introduces statements made by an adversary against his own interest that this makes such adversary a competent witness under said Section 1690. In many cases that would entirely defeat assertions of rights in the courts. For instance, in the case at bar many witnesses testified appellant never called herself Mrs. Martin until she undertook to renounce the will. She always referred to herself as Mrs. Moore. Several others said they went to the Martin home and she met them at the door, introduced herself as Mrs. Moore and said she was the housekeeper; showed them her room downstairs and the rooms of Martin, and of his deceased wife and of his minor son upstairs. Instances might be multiplied where estates of decedents would be at the mercy of claimants if they were made competent witnesses by proof of their acts or words disproving their asserted claims. Introduction of the tax returns did not waive the disqualification of appellant as a witness. The tax returns were competent as declarations against interest. 55 C. J. S., Sec. 44, p. 901. It is not contended they were not competent as such. The contention is that their introduction waived the disqualification of appellant as a witness under said Section 1690. The contention is not well taken.

Some other questions are raised but we do not deem them sufficiently serious to require discussion. We find no error in this proceeding.

Affirmed.

*Hall, Lee, Arrington* and *Ethridge, JJ.,* concur.