LADNIER *v.* LADNIER'S ESTATE

No. 41006 February 23, 1959 109 So. 2d 338

*Rushing & Guice, Charles K. Pringle,* Biloxi, for appellant.

*Bidwell Adam, Mize, Thompson & Mize,* Gulfport, for appellees.

LEE, J.

For a number of years W. M. Ladnier, a bachelor, was a member of the board of supervisors from District No. 4 of Harrison County. He maintained his legal domicile in the Lizana community at the home of his father and mother. He departed this life on September 30, 1956, intestate; and, on October 4, 1956, on petition of his next of kin, letters of administration on his estate were issued to his brother, Royal Ladnier.

On April 2, 1957, Ruby L. Cross probated a claim in the sum of $1,127.35 against the estate. Two days later she filed her petition, under the name of Ruby Lee Cross Ladnier, alleging that she and the decedent had contracted a common-law marriage either in October or November 1941 in the presence of Mr. and Mrs. Robert C. Cross in Mobile, Alabama; that they had continued this relation; and that she was therefore the sole heir-at-law of the decedent, and as such, was entitled to inherit his estate.

The answer of all of the heirs, under the laws of descent and distribution, denied in detail all of the material allegations of the petition.

The sole issue, under the pleadings and the evidence, was whether or not the petitioner and the decedent were in fact parties to a common-law marriage, as a result of which, she was his lawful widow and was entitled to inherit his estate.

At the conclusion of the evidence, the chancellor took the cause under advisement, and, thereafter, on October 21, 1957, rendered a written opinion in which he held that the evidence was not sufficient to establish a common-law marriage, and dismissed the petition with prejudice. A final decree, in accordance therewith, was entered, and the petitioner appealed.

The record is elaborate, consisting of ten volumes and over sixteen hundred pages. About fourteen witnesses were offered by the petitioner, and thirty-two by the defendants. In addition, much documentary evidence was introduced.

The evidence for the petitioner was to the effect that, for many years, she and Ladnier often stayed together in her apartment. Some of the witnesses on occasions knocked on the door early in the morning and found him in the apartment, in the only bed therein. One witness said that he had cashed several checks drawn by petitioner in the name of Mrs. W. M. Ladnier. It was pretty gen-

erally known that, if people could not reach him at the courthouse, or in his district, they could find him at the petitioner's apartment or beauty shop; and he accepted telephone calls at both places. He received friends, public officials, and business associates at the apartment, giving the appearance that he was at home. Some of the witnesses testified that they had heard him introduce the petitioner as his wife, or as "the Mrs.", while others, although considering them to be husband and wife, had never heard him introduce or refer to her as his wife. The parties had attended a number of the conventions for supervisors, and, on occasions, she wore a badge customary for the wife of a supervisor. Two of the witnesses testified that, at several of these conventions, they had seen these parties rise when Mr. and Mrs. Ladnier were called on to stand up. Several hotel registers disclosed registrations therein of "W. M. Ladnier & Wife". One of the witnesses, a close friend of petitioner, knowing of their occupancy of the apartment, had them as a guest in her home, where they occupied the same room. She further testified about a trip by her and her husband and these parties to Hot Springs, Arkansas, in 1953, during which time the petitioner and the deceased stayed in the same room, and on which occasion, the deceased gave the petitioner a wedding ring with the bill of sale made out to "Ruby L. Cross". One witness testified that, during an illness of Ladnier, about four years before his death, and, in his last illness, the petitioner had a cot in his room at the hospital and stayed with him most of the time just as a wife would do. A number of the witnesses testified that the general repute of these parties was that they were married to each other or were husband and wife. Ladnier's laundry was often picked up and delivered at the petitioner's apartment. A witness, who professed familiarity with Ladnier's handwriting, identified several notes, in endearing terms toward the petitioner, and certain registrations, as his handwriting.

The evidence for the defendants was to this effect: A former employer for three years never heard of the petitioner other than as a divorced or single woman, and she had never referred to Ladnier as her husband.

Ladnier made six different oral declarations to the effect that he was not married and would not get married, as follows: (1) About March 1, 1953, when the witness was trying to sell him some life insurance, Ladnier replied that he was not married and that he would not marry as long as his parents lived. (2) About eighteen months before death, Ladnier told the witness that he could not get married because his parents were getting old, and he felt that he should take care of them. (3) A witness had several discussions with Ladnier, who said that he was not married; and he further said that he would not marry petitioner because she could not bear children, and he wanted to marry someone and raise a family. (4) The witness, a man who had traveled with Ladnier more than anybody else, said that he never disclosed any marital relations with the petitioner; that he said he would never get married as long as his mother lived; and that the witness had seen and called Ladnier at the petitioner's apartment several times because "I knew that she was his girl friend". (5) In 1953, after the witness got married, he was joking with Ladnier about getting married, and Ladnier told him that he "just fooled around", that he was too old, had waited too long, and he did not "reckon" that he would ever get married. (6) About three years before the trial, the witness asked Ladnier if he was married, and he replied that he was single; and he also asked if he and "Miss Ruby" (petitioner) were ever going to get married, and he said "no".

One witness testified that, on a trip by her, her husband, Ruby and Ladnier, to Florida, petitioner said that she had dated Ladnier for nine years, to which the witness responded that she would not "string along" with a man that long, and petitioner laughed and said to Lad-

nier "Did you hear what Ida said?", and that Ladnier merely laughed. Again in 1954, petitioner said to her, "You know, I believe that if it weren't for W. M.'s mother and daddy, he would marry me."

Gatha Ladnier testified that he had talked to the petitioner hundreds of times that she never made any statement to indicate that she was W. M. Ladnier's wife, and that W. M. had never made an acknowledgment of any such relation. Other evidence was to the effect that the petitioner was generally regarded by the Ladnier family as W. M.'s girl friend; and she was always introduced by the family as "Miss Cross."

Many witnesses testified that the general repute concerning W. M. Ladnier was that he was a single man.

Stanford E. Morse, Jr. testified that, just a few days before Ladnier died, he was at the hospital to inquire about the man's condition; and that the petitioner came up to him, introduced herself as "Ruby Cross", and said, "I am Ruby Cross, I am W. M.'s girl friend."

Neither of the witnesses, in whose presence, it was alleged, Ladnier declared the petitioner to be his wife in Mobile, Alabama, in October or November 1941, testified in the case.

The defendants also offered evidence to show that petitioner in the name of Ruby L. Cross did the following things: The petitioner registered June 28, 1947, in that name. Poll tax receipts were issued to her in that name. She voted ten times, for the years 1947-1957 inclusive, in that name. The telephone in her apartment was continuously in that name. Checks in payment of rent on the apartment were issued in that name. Her account at the bank was in that name. There was never an account at the bank in the name of Mrs. Ruby or W. M. Ladnier, and of course she had drawn no checks in either of those names. The privilege tax for her car for 1955 was in that name. The conditional sales contract on her car was in that name. Her authorized signature card

to the bank was in that name. Her Federal Income Tax Returns for 1945 and 1946 were in that name. She worked, took out her social security card, and obtained her license, in that name. She probated an account against the estate of W. M. Ladnier on April 2, 1957, for the sum of $1,127.35 in that name and swore to it under that name. The bill of sale for the alleged wedding ring was made out in the name of Ruby L. Cross.

The defendants also offered evidence to show that W. M. Ladnier in his Federal Income Tax Returns for the years 1946-1955, inclusive, did not claim the petitioner as a dependent, and gave no indication that he was a married man. In his State Income Tax Returns for the years 1948-1955, inclusive, he declared that he was not married or living with a wife. In a deed of trust to the bank, he declared that he was "a single person", and acknowledged the execution thereof as "a single person." In a deed and two oil and gas leases in 1952 and in a deed in 1954, he declared, respectively, "I, W. M. Ladnier, a single person", "W. M. Ladnier, a single man", "W. M. Ladnier, an unmarried man", and "I, Willie M. Ladnier, a single man." Only he and H. S. Saucier could enter Ladnier's safety box at the bank.

In the trial of the cause, many objections to the admissibility of evidence were interposed. Some were sustained, others were overruled, and in others, the court reserved the rulings and later passed thereon. On this appeal, counsel on both sides very wisely refrained from attempting to pinpoint error in this respect, evidently realizing that possible errors in those particulars would not, in themselves, warrant a change in the ultimate result.

It is clear from the record that the petitioner and W. M. Ladnier spent much of their time together. They were shown to have stayed, at times, in the same room, and obviously they engaged in sexual intercourse. Whether their conduct stemmed from the feeling that they were

husband and wife, or whether it sprang from a mutual purpose to gratify their normal sexual desires was a question for solution.

Common-law marriages have often been recognized as valid in this State. Simms v. Sims, 122 Miss. 745, 85 So. 73; Sykes v. Sykes, 162 Miss. 487, 139 So. 853; Jones v. Lamensdorf, 175 Miss. 565, 167 So. 624. There is no question but that they could be validly contracted. Butler's Estate v. McQuarters, 210 Miss. 86, 48 So. 2d 617.

The alleged common-law marriage, in this case, if established, would not be affected by Chapter 239, Laws of 1956, by which such marriages thereafter were invalidated.

 To establish the existence of a common-law marriage, it is necessary to show an agreement between the parties that they intend themselves to be husband and wife, and this agreement must be followed by cohabitation. Sims v. Sims, supra; Hunt v. Hunt, 172 Miss. 732, 161 So. 119; Barton v. State, 165 Miss. 355, 143 So. 861; Jones v. Lamensdorf, supra.

In Ridley v. Compton, 215 Miss. 532, 61 So. 2d 341, this Court said: *"But a claim of common law marriage is regarded with suspicion and will be closely scrutinized, and in order to establish a common law marriage, all the essential elements of such a relationship must be shown to exist.* 55 C. J. S., p. 911, Marriage, par. 45 b; U. S. Fid. & Guar. Co. v. Smith, 211 Miss. 573, 52 So. 2d 351. (Emphasis supplied.)

" 'The word "cohabitation" as used in the marriage laws means the public assumption by a man and a woman of the marital relation, and dwelling together as such, thereby holding themselves out to the public as being man and wife.' Hunt v. Hunt, 172 Miss. 732, 161 So. 119. And, as stated by the Court in the case of Barton v. State, 165 Miss. 355, 143 So. 861, 'It is, of course, among the essentials of a valid common law marriage that both parties must intend in good faith to live together in the relation

of husband and wife, and that the union shall be permanent and exclusive of all others. 38 C. J. 1317, 1318. The agreement between the parties must be unequivocal and free from any reservations, mental or otherwise, to the full extent that, when consummated by cohabitation, nothing less than a decree of divorce pronounced by a court of competent jurisdiction can dissolve the relation.' " See also Whitman v. Whitman, 206 Miss. 838, 41 So. 2d 22; Martin v. Martin's Estate, 217 Miss. 173, 63 So. 2d 827.

In United States Fid. & Guar. Co. v. Smith, 211 Miss. 573, 52 So. 2d 351, the Court said: "The existence of a common-law marriage may be shown by the acts and timely declaration of the parties. But 'A claim of common-law marriage is regarded with suspicion and will be closely scrutinized. Thus, in order to establish a common-law marriage, all the essential elements of such a relationship . . . must be shown by *clear, consistent, and convincing evidence,* especially must all the essential elements of such relationship be shown when one of the parties is dead.' 55 C. J. S., Marriage, Section 45, page 911." (Emphasis supplied.)

In United Timber & Lumber Co., et al. v. Alleged Dependents of Alex Hill, Deceased, 226 Miss. 540, 84 So. 2d 921, the Court said: "While common law marriages are recognized in this State, the claim of a common law marriage is regarded with suspicion and will be closely scrutinized. The agreement between the parties must be unequivocal and free from any reservations, mental or otherwise, to the full extent that, when consummated by cohabitation, nothing less than a decree of divorce pronounced by a court of competent jurisdiction can dissolve the relation. Ridley v. Compton, 215 Miss. 532, 61 So. 2d 341."

In other words, running throughout the decisions are found these governing principles: (1) Common-law marriages have been recognized in this State. (2) But a claim of such a marriage is regarded with

suspicion and will be closely scrutinized. (3) The burden is on the one who asserts a claim of such marriage. (4) All of the essential elements of such a relationship must be shown to exist. (5) When one of the parties is dead, the existence of all of the essential elements must be shown by clear, consistent, and convincing evidence.

If these two substantially prominent people—the man, a bachelor, fifty-one years of age at the time of his death, and the woman, a divorcee, several years his junior—in good faith had set out to contract and establish a marriage relationship, why, it is pertinent to ask, did they not celebrate a ceremonial marriage? Evidently such failure must have been a source of wonder to the learned trial judge.

It appears, on a reference to the evidence pro and con, how sharply the issue was in dispute. On the one hand, it was said that Ladnier, in several instances, either expressly or tacitly held out the petitioner as his wife. But, on the other hand, in a greater number of instances, it was said that, by his statements and declarations, he maintained that she was not his wife. The testimony about the trip to Florida and the ensuing conversation, and the subsequent opinion of the petitioner that W. M. would marry her but for his parents, as well as introducing herself to Senator Morse as W. M.'s "girl friend" would indicate that the petitioner certainly was not sure that the relationship of husband and wife existed between them.

A further analysis of the conflicts in the evidence is unnecessary. While there was some evidence of the existence of the relationship of common-law marriage, it was not sufficiently clear, consistent and convincing to establish all of the essentials of such relationships; at least the trial judge was fully warranted in so holding. The decree was not against the overwhelming weight of the evidence. Neither was it manifestly wrong. On the

contrary, it appears to be supported by the preponderance of the evidence.

From which it follows that the decree in this cause must be, and is, affirmed.

Affirmed.

*McGehee, C. J.,* and *Kyle, Holmes* and *Arrington, JJ.,* concur.