227 So.2d 829 (1969)
In the Matter of the Last Will and Testament of Fannie Traylor MOSES, Deceased.
Clarence H. HOLLAND
v.
Nettie Ree TRAYLOR et al.
No. 45282.
Supreme Court of Mississippi.
November 3, 1969.
*830 Satterfield, Shell, Williams & Buford, Jackson, for appellant.
*831 Watkins, Pyle, Edwards, Ludlam, Winter & Stennis, William A. Pyle, Bob Ray, Jackson, for appellees.

ON PETITION FOR REHEARING
SMITH, Justice:
Mrs. Fannie Traylor Moses died on February 6, 1967. An instrument, dated December 23, 1957 and purporting to be her last will and testament, was duly admitted to probate in common form in the Chancery Court of the First Judicial District of Hinds County. Thereafter, on February 14, 1967, appellant, Clarence H. Holland, an attorney at law, not related to Mrs. Moses, filed a petition in that court tendering for probate in solemn form, as the true last will and testament of Mrs. Moses, a document dated May 26, 1964, under the terms of which he would take virtually her entire estate. This document contained a clause revoking former wills and Holland's petition prayed that the earlier probate of the 1957 will be set aside.
The beneficiaries under the 1957 will (the principal beneficiary was an elder sister of Mrs. Moses) responded to Holland's petition, denied that the document tendered by him was Mrs. Moses' will, and asserted, among other things, that it was (1) the product of Holland's undue influence upon her, (2) that at the time of its signing, Mrs. Moses lacked testamentary capacity, and, (3) that the 1957 will was Mrs. Moses' true last will and testament and its probate should be confirmed. By cross bill, respondents prayed that Holland's apparent ownership of an interest in certain real estate had been procured by undue influence and that it should be cancelled as a cloud upon the title of Mrs. Moses, the true owner.
By agreement, the case was heard by the chancellor without a jury.
After hearing and considering a great deal of evidence, oral and documentary, together with briefs of counsel, the chancellor, in a carefully considered opinion, found that (1) the 1964 document, tendered for probate by Holland, was the product of undue influence and was not entitled to be admitted to probate, (2) the earlier probate of the 1957 will should be confirmed and, (3) Mrs. Moses had been the true owner of the interest claimed by Holland in the real estate and his claim of ownership should be cancelled as a cloud upon the title of Mrs. Moses.
Holland's appeal is from the decree entered denying probate to the 1964 document and cancelling his claim to an undivided one-half interest in the real estate.
A number of grounds are assigned for reversal. However, appellant's chief argument is addressed to the proposition that even if Holland, as Mrs. Moses' attorney, occupied a continuing fiduciary relationship with respect to her on May 26, 1964, the date of the execution of the document under which he claimed her estate, the presumption of undue influence was overcome because, in making the will, Mrs. Moses had the independent advice and counsel of one entirely devoted to her interests. It is argued that, for this reason, a decree should be entered here reversing the chancellor and admitting the 1964 will to probate. The question as to the land would then become moot as Holland would take it under the residuary clause of the 1964 will.
A brief summary of facts found by the chancellor and upon which he based his conclusion that the presumption was not overcome, follows:
Mrs. Moses died at the age of 57 years, leaving an estate valued at $125,000. She had lost three husbands in less than 20 years. Throughout the latter years of her life her health became seriously impaired. She suffered from serious heart trouble and cancer had required the surgical removal of one of her breasts. For 6 or 7 years preceding her death she was an alcoholic.
On several occasions Mrs. Moses had declared her intention of making an elder sister her testamentary beneficiary. She had once lived with this sister and was grateful *832 for the many kindnesses shown her. Mrs. Moses' will of December 23, 1957 did, in fact, bequeath the bulk of her estate to this sister.
The exact date on which Holland entered Mrs. Moses' life is unclear. There is a suggestion that she had met him as early as 1951. Their personal relationship became what the chancellor, somewhat inaccurately, characterized, as one of "dubious" morality. The record, however, leaves no doubt as to its nature. Soon after the death of Mrs. Moses' last husband, Holland, although 15 years her junior, began seeing Mrs. Moses with marked regularity, there having been testimony to the effect that he attended her almost daily. Holland was an attorney and in that capacity represented Mrs. Moses. She declared that he was not only her attorney but her "boyfriend" as well. On August 22, 1961, a date during the period in which the evidence shows that Holland was Mrs. Moses' attorney, she executed a document purporting to be her will. This instrument was drawn by an attorney with whom Holland was then associated and shared offices, and was typed by a secretary who served them both. It was witnessed by Holland's associate and their secretary. In addition to other testamentary dispositions, this document undertook to bequeath to Holland "my wedding ring, my diamond solitare ring and my three gold bracelets containing twenty-five (25) pearls each." In it Holland is referred to as "my good friend." The validity of this document is not an issue in the present case.
After Mrs. Moses died, the 1964 will was brought forward by another attorney, also an associate of Holland, who said that it had been entrusted to him by Mrs. Moses, together with other papers, for safekeeping. He distinguished his relation with Holland from that of a partner, saying that he and Holland only occupied offices together and shared facilities and expenses in the practice of law. He also stated that he saw Mrs. Moses on an "average" of once a week, most often in the company of Holland.
Throughout this period, Mrs. Moses was a frequent visitor at Holland's office, and there is ample evidence to support the chancellor's finding that there existed a continuing fiduciary relationship between Mrs. Moses and Holland, as her attorney.
In May, 1962, Holland and the husband of Holland's first cousin, one Gibson, had contracted to buy 480 acres of land for $36,000. Mrs. Moses was not, it appears, originally a party to the contract. Gibson paid the $5,000 earnest money but testified that he did not know where it had come from and assumed that it came from Mrs. Moses. At the time, Mrs. Moses had annuity contracts with a total maturity value of some $40,000 on which she obtained $31,341.11. This sum was deposited in a bank account called "Cedar Hills Ranch." She gave Holland authority to check on this account, as well as upon her personal account. About this time, Gibson disappeared from the land transaction. On June 7, 1962, the deal was closed. At closing, the persons present, in addition to the grantors and their agents and attorney, were Mrs. Moses and Holland, her attorney. Mrs. Moses had no other counsel. Holland issued a check on the Cedar Hills Ranch account (in which only Mrs. Moses had any money) for the $31,000 balance. Although none of the consideration was paid by Holland, the deed from the owners purported to convey the land to Holland and Mrs. Moses in equal shares, as tenants in common. On the day following, Holland issued another check on the Cedar Hills Ranch account (in which he still had deposited no money) for $835.00 purportedly in payment for a tractor. This check was issued by Holland to his brother. Eight days later Holland drew another check on this account for $2,100.00 purportedly for an undisclosed number of cattle. This check was issued to Holland's father.
The evidence supports the chancellor's finding that the confidential or fiduciary relationship which existed between Mrs. Moses and Holland, her attorney, was a subsisting and continuing relationship, *833 having begun before the making by Mrs. Moses of the will of August 22, 1961, under the terms of which her jewelry had been bequeathed to Holland, and having ended only with Mrs. Moses' death. Moreover, its effect was enhanced by the fact that throughout this period, Holland was in almost daily attendance upon Mrs. Moses on terms of the utmost intimacy. There was strong evidence that this aging woman, seriously ill, disfigured by surgery, and hopelessly addicted to alcoholic excesses, was completely bemused by the constant and amorous attentions of Holland, a man 15 years her junior. There was testimony too indicating that she entertained the pathetic hope that he might marry her. Although the evidence was not without conflict and was, in some of its aspects, circumstantial, it was sufficient to support the finding that the relationship existed on May 26, 1964, the date of the will tendered for probate by Holland.
The chancellor's factual finding of the existence of this relationship on that date is supported by evidence and is not manifestly wrong. Moreover, he was correct in his conclusion of law that such relationship gave rise to a presumption of undue influence which could be overcome only by evidence that, in making the 1964 will, Mrs. Moses had acted upon the independent advice and counsel of one entirely devoted to her interest.
Appellant takes the position that there was undisputed evidence that Mrs. Moses, in making the 1964 will, did, in fact, have such advice and counsel. He relies upon the testimony of the attorney in whose office that document was prepared to support his assertion.
This attorney was and is a reputable and respected member of the bar, who had no prior connection with Holland and no knowledge of Mrs. Moses' relationship with him. He had never seen nor represented Mrs. Moses previously and never represented her afterward. He was acquainted with Holland and was aware that Holland was a lawyer.
A brief summary of his testimony, with respect to the writing of the will, follows:
Mrs. Moses had telephoned him for an appointment and had come alone to his office on March 31, 1964. She was not intoxicated and in his opinion knew what she was doing. He asked her about her property and "marital background." He did this in order, he said, to advise her as to possible renunciation by a husband. She was also asked if she had children in order to determine whether she wished to "pretermit them." As she had neither husband nor children this subject was pursued no further. He asked as to the values of various items of property in order to consider possible tax problems. He told her it would be better if she had more accurate descriptions of the several items of real and personal property comprising her estate. No further "advice or counsel" was given her.
On some later date, Mrs. Moses sent in (the attorney did not think she came personally and in any event he did not see her), some tax receipts for purposes of supplying property descriptions. He prepared the will and mailed a draft to her. Upon receiving it, she telephoned that he had made a mistake in the devise of certain realty, in that he had provided that a relatively low valued property should go to Holland rather than a substantially more valuable property which she said she wanted Holland to have. He rewrote the will, making this change, and mailed it to her, as revised, on May 21, 1964. On the one occasion when he saw Mrs. Moses, there were no questions and no discussion of any kind as to Holland being preferred to the exclusion of her blood relatives. Nor was there any inquiry or discussion as to a possible client-attorney relationship with Holland. The attorney-draftsman wrote the will according to Mrs. Moses' instructions and said that he had "no interest in" how she disposed of her property. He testified "I try to draw the will to suit their purposes and if she (Mrs. *834 Moses) wanted to leave him (Holland) everything she had, that was her business as far as I was concerned. I was trying to represent her in putting on paper in her will her desires, and it didn't matter to me to whom she left it * * * I couldn't have cared less."
When Mrs. Moses returned to the office to execute the will, the attorney was not there and it was witnessed by two secretaries. One of these secretaries, coincidentally, had written and witnessed the 1961 will when working for Holland and his associate.
The attorney's testimony supports the chancellor's finding that nowhere in the conversations with Mrs. Moses was there touched upon in any way the proposed testamentary disposition whereby preference was to be given a nonrelative to the exclusion of her blood relatives. There was no discussion of her relationship with Holland, nor as to who her legal heirs might be, nor as to their relationship to her, after it was discovered that she had neither a husband nor children.
It is clear from his own testimony that, in writing the will, the attorney-draftsman, did no more than write down, according to the forms of law, what Mrs. Moses told him. There was no meaningful independent advice or counsel touching upon the area in question and it is manifest that the role of the attorney in writing the will, as it relates to the present issue, was little more than that of scrivener. The chancellor was justified in holding that this did not meet the burden nor overcome the presumption.
In Croft v. Alder, 237 Miss. 713, 724, 115 So.2d 683, 686 (1959) there was an extensive review of the authorities relating to the question here under consideration. This Court said:
Meek v. Perry, 1858, 36 Miss. 190, 243, 244, 252, 259, is perhaps the leading case. It involved a will by a ward leaving a substantial amount of her property to her guardian. The Court held that the presumption of invalidity applies to wills as well as deeds. It was said the law watches with the greatest jealously transactions between persons in confidential relations and will not permit them to stand, unless the circumstances demonstrate the fullest deliberation on the part of the testator and the most abundant good faith on the part of the beneficiary. Hence the law presumes the existence of undue influence, and such dealings are prima facie void, and will be so held "unless the guardian show by clearest proof" that he took no advantage over the testator, and the cestui's act was a result of his own volition and upon the fullest deliberation. * * *
Moreover, even where there is no presumption of undue influence, the burden of proof rests upon the proponents throughout and never shifts to the contestants, both on undue influence and mental incapacity. Cheatham v. Burnside, 1954, 222 Miss. 872, 77 So.2d 719. From its very nature, evidence to show undue influence must be largely circumstantial. Undue influence is an intangible thing, which only rarely is susceptible of direct or positive proof. As was stated in Jamison v. Jamison, 1909, 96 Miss. 288, 51 So. 130, "the only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred." * * *
The able and respected attorney who prepared the will upon data furnished him by Barney, who stated he was acting for Mr. Alder, testified that, in his opinion, the testator was mentally competent and the instrument reflected testator's independent purpose. However, the record indicates that the witness had not conferred with Mr. Alder about the will prior to its drafting. Moreover, his testimony does not negative the presumption of undue influence resulting from "antecedent agencies" and prior actions by the principal beneficiary who was in the confidential relation. In Jamison v. Jamison, *835 1909, 96 Miss. 288, 298, 51 So. 130, 131, it was said: "The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills, and testify as to the testamentary capacity of the testator, and the circumstances attending the immediate execution of the instrument; but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had any knowledge of them, which they seldom have." In re Coins' Will (Fortner v. Coins), 1959, [237 Miss. 322] 114 So.2d 759.
We do not think that the testimony of the attorney who attested the will, as to his observations at that particular time, can suffice to rebut the already existing presumption. As stated in Jamison, he naturally would have had no knowledge of any precedent activities by Barney. (emphasis added).
In Croft, supra, this Court quoted the rule as stated in 57 Am.Jur. Wills sections 389, 390 as follows:
* * * [A]lthough the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary exercised undue influence over the testator, as it does with gifts inter vivos, such consequence follows where the beneficiary "has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;" * * * (emphasis added).
See also Young v. Martin, 239 Miss. 861, 125 So.2d 734, 126 So.2d 529 (1961).
Holland, of course, did not personally participate in the actual preparation or execution of the will. If he had, under the circumstances in evidence, unquestionably the will could not stand. It may be assumed that Holland, as a lawyer, knew this.
In Croft, supra, this Court said that the presumption of undue influence in the production of a will may arise from "antecedent circumstances" about which its draftsman and the witnesses knew nothing. The rule, as stated in that case, is that undue influence will be presumed where the beneficiary "has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator." (emphasis added).
Undue influence operates upon the will as well as upon the mind. It is not dependent upon a lack of testamentary capacity.
The chancellor's finding that the will was the product of Holland's undue influence is not inconsistent with his conclusion that "Her (Mrs. Moses) mind was capable of understanding the essential matters necessary to the execution of her will on May 26, 1964, at the time of such execution." A weak or infirm mind may, of course, be more easily over persuaded. In the case under review, Mrs. Moses was in ill health, she was an alcoholic, and was an aging woman infatuated with a young lover, 15 years her junior, who was also her lawyer. If this combination of circumstances cannot be said to support the view that Mrs. Moses suffered from a "weakness or infirmity" of mind, vis-a-vis Holland, it was hardly calculated to enhance her power of will where he was concerned. Circumstances *836 in evidence, both antecedent and subsequent to the making of the will, tend to accord with that conclusion.
The sexual morality of the personal relationship is not an issue. However, the intimate nature of this relationship is relevant to the present inquiry to the extent that its existence, under the circumstances, warranted an inference of undue influence, extending and augmenting that which flowed from the attorney-client relationship. Particularly is this true when viewed in the light of evidence indicating its employment for the personal aggrandizement of Holland. For that purpose, it was properly taken into consideration by the chancellor.
In 94 C.J.S. Wills § 253 (1956) it is stated:
The mere existence of illicit, improper, unlawful, or meretricious relations between the testator and the beneficiary or the beneficiary's mother is insufficient of itself to prove fraud or undue influence, although the existence of such relations is an important fact to be considered by the jury along with other evidence of undue influence, giving to other circumstances a significance which they might not otherwise have; and much less evidence will be required to establish undue influence on the part of one holding wrongful and meretricious relations with the testator.
In Croft and Taylor, supra, the beneficiary was present at or participated at some stage or in some way in the preparation or execution of the will. However, it is to be noted that it was the "antecedent circumstances" which gave rise to the presumption of undue influence, and that this was not overcome by testimony of an independent lawyer-draftsman who testified that the will reflected the independent wishes of the testator who had been of sound mind and had known what he was doing.
The rule laid down in Croft, supra, would have little, if any, practical worth, if, under circumstances such as those established in this case, it could be nullified by a mere showing that the beneficiary was not physically present when the will was prepared and executed.
The rule that where a fiduciary relationship has been established, a presumption of undue influence arises, is not limited to holographs, nor confined to wills otherwise prepared by the testator himself. It encompasses with equal force wills written for the testator by a third person. There is no sound reason supporting the view that a testator, whose will has become subservient to the undue influence of another, is purged of the effects of that influence merely because the desired testamentary document is prepared by an attorney who knows nothing of the antecedent circumstances.
The chancellor was justified in finding that the physical absence of Holland during Mrs. Moses' brief visit to the office of the attorney who wrote the will did not suffice to abate or destroy the presumption of undue influence.
The chancellor was the judge of the credibility of the witnesses and the weight and worth of their testimony. Moreover, as trier of facts, it was for him to resolve conflicts and to interpret evidence where it was susceptible of more than one reasonable interpretation. It was also his prerogative to draw reasonable inferences from facts proved. As said in Croft, supra, "[T]he only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred." This Court, in passing upon the sufficiency of the evidence to support the factual findings of the chancellor, must accept as true all that the evidence proved or reasonably tended to prove, together with all reasonable inferences to be drawn from it, supporting such findings.
Viewed in the light of the above rules, it cannot be said that the chancellor was manifestly wrong in finding that Holland occupied a dual fiduciary relationship with respect *837 to Mrs. Moses, both conventional and actual, attended by suspicious circumstances as set forth in his opinion, which gave rise to a presumption of undue influence in the production of the 1964 will, nor that he was manifestly wrong in finding that this presumption was not overcome by "clearest proof" that in making and executing the will Mrs. Moses acted upon her "own volition and upon the fullest deliberation," or upon independent advice and counsel of one wholly devoted to her interest.
Other grounds assigned by appellant as requiring reversal and retrial, are that: (1) there was a waiver of Holland's incompetency as a witness and (2) the issue as to Holland's claim to an interest in the land should not have been heard or decided.
The first of these, that there was a waiver of Holland's incompetency to testify as a witness to establish his claim or defense against the estate of a deceased person, is predicated upon two propositions. It is asserted that: (a) a waiver occurred when appellee obtained pretrial inspection of documents in Holland's possession, including his income tax returns, bank statements, and other papers and used them in evidence, and (b) if mistaken in that contention, an express waiver occurred, when, an objection to allowing Holland to testify as a witness having been sustained theretofore, a written statement of what Holland's testimony would have been if he had been permitted to testify was sought to be introduced over the objection of appellees.
Holland was incompetent to testify under Mississippi Code 1942 Annotated section 1690 (1956).
The contention that pretrial inspection and use in evidence of papers in Holland's possession constituted a waiver of his incompetency as a witness under the statute has been answered in the negative by this Court in at least two cases. Martin v. Martin's Estate, 217 Miss. 173, 63 So.2d 827 (1953) and Veazey v. Turnipseed, 219 Miss. 559, 69 So.2d 379 (1954).
In arguing the second facet of the contention that there was a waiver of Holland's incompetency, appellant relies upon a remark by counsel for appellees made in the course of the trial, near the close of appellant's presentation of his case in chief, when a previously prepared written document, containing a statement of what Holland's testimony would be if he were permitted to testify, was sought to be introduced by appellant over the objection of appellees. When this document was offered there ensued an extended colloquy between the court and counsel for both sides. When it appeared that there was a possibility that the court might admit the statement, described by appellees as wholly "self serving," counsel for appellees continued strenuously to object, claiming that the introduction of the statement was an effort on Holland's part to circumvent the statute and by this means to get his testimony before the court. Counsel's position was that, if this were done, he would withdraw his previous objection to Holland as a witness in order that he might be afforded the privilege of cross examination. When the court ruled that the written statement would not be admitted, counsel for appellees stated that, in view of the court's ruling, the objection to Holland as a witness would not be withdrawn. The record clearly shows that what actually happened during this colloquy between the court and counsel was that counsel for appellees apprehended that the court might admit Holland's written statement, and proposed to withdraw the objection for purposes of cross examination in that event. This eventuality not having occurred, the objection was not withdrawn. Apparently, at the time, appellant's counsel did not consider the objection withdrawn, as Holland was not again offered as a witness. There is no merit in the contention that this constituted an irrevocable waiver of Holland's incompetency.
Nor is there merit in appellant's contention that the court should neither have heard nor decided the issue relating to Holland's apparent claim of an interest *838 in the land purchased by Mrs. Moses. Mississippi Code 1942 Annotated section 1307 (1956) provides in part:
* * * [T]he uniting in one bill of several distinct and unconnected matters of equity against the same defendants shall not be an objection to the bill.
In this case, although there were others who necessarily were made parties, the only issues litigated were with Holland. However, it is unnecessary to decide whether the present case falls within the quoted provision of section 1307 for the reason that appellees' cross bill specifically sought cancellation of Holland's claim to an interest in the land and, as to this, Holland's responsive pleadings joined issue. Appellant did not challenge the propriety of the determination of that issue by demurrer or otherwise. The case was tried and the entire matter heard, concluded and decided and this question was not raised by Holland at any time during the trial. The question may not be raised here for the first time. Ford v. United Gas Corp., 254 F.2d 817 (5th Cir.); cert. denied, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958), Sansing v. Thomas, 211 Miss. 727, 52 So.2d 478 (1951) and Parkinson v. Mills, 172 Miss. 784, 159 So. 651 (1935).
As stated in Croft, supra, the rule that a presumption of undue influence arises when a fiduciary relationship is established applies with even greater stringency in cases of transactions inter vivos. In the land transaction, Holland attended as Mrs. Moses' attorney. She had no other advice or counsel. The chancellor correctly held that, under the circumstances, Holland, as her attorney, could take no interest adverse to Mrs. Moses in the land purchased by her. He took title to the half interest in the land as trustee for Mrs. Moses and not otherwise. His apparent claim of ownership of a half interest was properly cancelled and removed as a cloud upon the title of Mrs. Moses to the complete fee. Johnson v. Outlaw, 56 Miss. 541 (1879) and Cameron v. Lewis, 56 Miss. 601 (1879). See also Sojourner v. Sojourner, 247 Miss. 342, 153 So.2d 803, 156 So.2d 579 (1963) and Smith v. Dean, 240 S.W.2d 789 (Tex.Civ.App.) (1951).
For the foregoing reasons, the petition for rehearing is sustained, the original majority opinion is withdrawn, this opinion will be that of the Court, and the decree of the chancery court will be affirmed.
Petition for rehearing sustained, original opinion withdrawn, and decree of chancery court affirmed.
ETHRIDGE, C.J., and GILLESPIE, RODGERS and JONES, JJ., concur.
BRADY, PATTERSON, INZER and ROBERTSON, JJ., dissent.
ROBERTSON, Justice (dissenting):
I am unable to agree with the majority of the Court that Mrs. Moses should not be allowed to dispose of her property as she so clearly intended.
Since 1848 it has been the law of this state that every person twenty-one years of age, male or female, married or unmarried, being of sound and disposing mind, has the power by last will and testament or codicil in writing to dispose of all of his or her worldly possessions as he or she sees fit. § 657 Miss.Code 1942 Ann. (1956).
In 1848 the Legislature also said:
"Whenever any last will and testament shall empower and direct the executor as to the sale of property, the payment of debts and legacies, and the management of the estate, the directions of the will shall be followed by the executor * * *." § 518 Miss.Code 1942 Ann. (1956). (Emphasis added).
The intent and purpose of the lawmakers was crystal clear: No matter what the form of the instrument, if it represented the free, voluntary and knowledgeable act of the testator or testatrix it was a good will, and the directions of the will should *839 be followed. We said in Gillis v. Smith, 114 Miss. 665, 75 So. 451 (1917):
"`A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice.'" 114 Miss. at 677, 75 So. at 453. (Emphasis added).
Mrs. Fannie T. Moses was 54 years of age when she executed her last will and testament on May 26, 1964, leaving most of her considerable estate to Clarence H. Holland, her good friend, but a man fifteen years her junior. She had been married three times, and each of these marriages was dissolved by the death of her husband. Holland's friendship with Mrs. Moses dated back to the days of her second husband, Robert L. Dickson. He was also a friend of her third husband, Walter Moses.
She was the active manager of commercial property in the heart of Jackson, four apartment buildings containing ten rental units, and a 480-acre farm until the day of her death. All of the witnesses conceded that she was a good businesswoman, maintaining and repairing her properties with promptness and dispatch, and paying her bills promptly so that she would get the cash discount. She was a strong personality and pursued her own course, even though her manner of living did at times embarrass her sisters and estranged her from them.
The chancellor found that she was of sound and disposing mind and memory on May 26, 1964, when she executed her last will and testament, and I think he was correct in this finding.
The chancellor found that there was a confidential relationship between Mrs. Moses and Holland, who had acted as her attorney in the past, and who was, in addition, a close and intimate friend, and that because of this relationship and some suspicious circumstances a presumption of undue influence arose.
In Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959), this Court said:
"57 Am.Jur., Wills, Secs. 389, 390, state that, although the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary exercised undue influence over the testator, as it does with gifts inter vivos, such consequence follows where the beneficiary `has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;' or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit. * * *" 237 Miss. at 723-724, 115 So.2d at 686. (Emphasis added).
There is no proof in this voluminous record that Holland ever did or said anything to Mrs. Moses about devising her property to anybody, much less him. It is conceded that in the absence of the presumption of undue influence that there is no basis to support a finding that Holland exercised undue influence over Mrs. Moses. This being true, the first question to be decided is whether the presumption of undue influence arises under the circumstances of this case.
It is my opinion that the presumption did not arise. The fact, alone, that a confidential relationship existed between Holland and Mrs. Moses is not sufficient to give rise to the presumption of undue influence in a will case. We said in Croft, supra:
"[S]uch consequence follows where the beneficiary `has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;' or where the beneficiary in the confidential relation *840 was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit." 237 Miss. at 723-724, 115 So.2d at 686. (Emphasis added).
It was not contended in this case that Holland was in any way actively concerned with the preparation or execution of the will. Appellees rely solely upon the finding of the chancellor that there were suspicious circumstances. However, the suspicious circumstances listed by the chancellor in his opinion had nothing whatsoever to do with the preparation or execution of the will. These were remote antecedent circumstances having to do with the meretricious relationship of the parties, and the fact that at times Mrs. Moses drank to excess and could be termed an alcoholic, but there is no proof in this long record that her use of alcohol affected her will power or her ability to look after her extensive real estate holdings. It is common knowledge that many persons who could be termed alcoholics, own, operate and manage large business enterprises with success. The fact that she chose to leave most of her property to the man she loved in preference to her sisters and brother is not such an unnatural disposition of her property as to render it invalid.
In O'Bannon v. Henrich, 191 Miss. 815, 4 So.2d 208 (1941) O.O. O'Bannon, a bachelor about thirty-seven years of age and an alcoholic, executed a will devising his property to his fiancee, Miss Julia Henrich. His six brothers, one sister and four children of a deceased brother contested the validity of this will, alleging that:
"(1) At the time of the execution of the will, O'Bannon was mentally incapacitated therefor; and (2) `he was under undue influence with reference to the same to the extent that said alleged will is not the will of the reputed testator but that of another against his wish.'" 191 Miss. at 820, 4 So.2d at 208-209.
This Court said:
"[N]o evidence appears disclosing that O'Bannon was under any obligation, legal or otherwise, to devise his property to his brothers and sister, he therefore had the absolute right to devise his property to whomsoever he wished. The jury having found that he was of sound and disposing mind and memory, his will must be given effect unless it appears from the evidence that it does not express his real purpose and intent, but on the contrary that he was caused to make it by an influence exercised over him by another which virtually destroyed his free agency in the making of the will. The record is barren of any direct evidence that any influence whatever was exercised over him by anyone in this connection. No circumstances appear from which an inference of such influence can be drawn unless the relations between O'Bannon and the beneficiary in the will were of such a confidential nature that, when viewed in the light of the fact that without the will O'Bannon's property would have gone to his heirs-at-law, an inference that she unduly influenced him to make it is justified. * * *
* * * * * *
"* * * If the evidence disclosed that this beneficiary actually participated in the preparation of this will, or if the character of the devise itself, under the circumstances confronting the testator, could be said to be unreasonable or unnatural, a different question might be presented, on which we express no opinion. As hereinbefore said, the testator was under no obligation to leave his property to his brothers and sister, and we are unable to perceive how it could be said that it was unreasonable for him to leave it to the woman he loved and expected to marry. * * *" 191 Miss. at 821-823, 4 So.2d at 209. (Emphasis added).
In this case, there were no suspicious circumstances surrounding the preparation or execution of the will, and in my *841 opinion the chancellor was wrong in so holding. However, even if it be conceded that the presumption of undue influence did arise, this presumption was overcome by clear and convincing evidence of good faith, full knowledge and independent consent and advice.
When she got ready to make her will she called Honorable Dan H. Shell for an appointment. Shell did not know her, although he remembered that he had handled a land transaction for her third husband, Walter Moses, some years before. Shell had been in the active practice of law in Jackson since 1945; he was an experienced attorney with a large and varied practice.
The chancellor hearing this case said of him in his written opinion:
"Mr. Dan H. Shell is a highly reputable attorney. His integrity is unquestioned. This Court believes Mr. Shell's testimony, and finds that the circumstances surrounding the drawing of the instrument dated May 26, 1964, are exactly as he stated them from the witness stand. He testified that Mrs. Moses gave him the impression that she knew exactly what she was doing, and that there was no indication of outside influence. * * *" (Emphasis added).
She came alone to his office on March 31, 1964, and advised him that she wanted him to prepare a will for her. Mr. Shell testified that she was alert, intelligent and rational, and knew exactly what she was doing.
Mr. Shell was asked the question: "To what extent did you try to influence Mrs. Fannie Moses in drafting her will?" He answered:
"I didn't try to influence her at all. I asked her about the property and I asked her marital background, because I needed to know whether or not there would be a spouse who might have renunciation rights, I needed to know if she had children and as to whether or not she wanted to pretermit them if there were children. I wanted to know the general value of the properties so that I could advise her as to whether or not she might have an estate tax problem, and I ascertained that she probably did have and so advised her, but she said that it didn't matter to her, that this was the way she wanted to leave the property, so I drew the will in accordance with her specific directions." (Emphasis added).
He advised her that he needed specific legal descriptions of her various properties. She got this information and brought it to his office. He prepared the first draft of the will and mailed it to her on May 1, 1964. Shell testified:
"Then she called me in just a few days and pointed out that the will was not correct, that the property which I had described as being devised to Robert Miller was not the right tract of land and it should have been another piece of property that I had incorrectly devised to Clarence Holland and it should have been devised to Robert Miller, and the tract I had devised to Robert Miller should have been devised to Clarence Holland.
"Well, of course, I wanted it as she wanted it, so I immediately began to go about the revision. She sent in  I don't believe she came personally, or if she did she left with the receptionist some tax receipts which she thought would help me identify that property that I had misdescribed, and I did rewrite the will, and on May 21st I wrote her a short letter and sent her an original and two copies of the will as I had revised it. I did not see her when she came in later on May 26th or 27th  I don't remember what day it was  I was not in the office, I was in Court trying a case in Circuit Court, and I did not see her when she came in and actually signed the will, but I wrote the will on two separate occasions." (Emphasis added).
His testimony imports verity, and it stands uncontradicted.
*842 The majority was indeed hard put to find fault with his actions on behalf of his client. It is easy for us who are removed from the active practice of law to criticize our brethren who are "on the firing line." The question is, did he do all that was reasonably required of him to represent his client in the preparation of her will. He was not required to be perfect, nor was he required to meet a standard of exact precision. He ascertained that Mrs. Moses was competent to make a will; he satisfied himself that she was acting of her own free will and accord, and that she was disposing of her property exactly as she wished and intended. No more is required.
On May 26, 1964, Mrs. Moses came alone to Mr. Shell's office. She told Mrs. Mary L. Ward, one of Shell's secretaries, that she had her will, that Mr. Shell had fixed it exactly as she wanted it, and that she was ready to sign it. She signed it in the presence of Mrs. Ward and Antoinette Neely, another secretary in Shell's law firm, and they each signed as an attesting witness. Mrs. Ward testified that Mrs. Moses was alert, friendly and her usual self on this occasion.
Shell was asked the direct question:
"Q. Now in connection with the drawing of this will, what did Clarence Holland have to do with that?"
He answered:
"A. Not one thing on earth."
Shell was asked:
"Q. From that time up until the time of her death, did you ever discuss the matter with him?
A. About his being a devisee under the will, or even writing a will?
Q. Yes."
He answered:
"A. No. That was none of his business, as far as I was concerned. It was confidential between Mrs. Moses and myself."
In the majority opinion there are extensive quotations from Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959). Perhaps it would be well to place these in the context of the facts of that case.
John J. Alder, a widower who had no children, when he was about 87 years of age and while bedridden and a patient in the Coahoma County Hospital in Clarksdale, executed a will leaving 25 percent of his estate to Mary Ann Alder, his sister; 25 percent to his brother, Henry Alder; and 50 percent to his nephew, Barney L. Alder. This will was signed on March 18, 1957, and the testator died about eleven months later, on February 3, 1958.
The will of March 18, 1957, was probated in common form upon the affidavit of E.C. Black, one of the attesting witnesses. Black, an attorney, testified at the trial that the will was prepared from data and information given him by Barney, the principal beneficiary. Barney told Black that John J. Alder, his uncle, had requested him, Barney, to give this information to Black, and, at the same time, Barney delivered to Black a copy of the 1955 will of his uncle.
The first time John J. Alder knew anything about the will was when Black read it to him in the hospital room in the presence of Burdine and Barney. John J. Alder then signed it; Black and Burdine signed as attesting witnesses.
In Croft the Court was very careful to define and limit the suspicious circumstances that must exist, in addition to the confidential relationship, to even raise the presumption of undue influence. The specific examples listed were where the beneficiary actively participated in the preparation of the will, actually drafted it, or assisted in its execution. All of these carefully tabulated suspicious circumstances were present in the Croft case.
The facts in this case were entirely different. Mrs. Moses was 54 years old (Alder *843 was 87) when she executed her will. She went alone to the law office of an independent, capable and experienced attorney. She herself told him how she wanted to devise her property. This was on March 31, 1964. After she had pointed out an error in the first draft to Mr. Shell he corrected and rewrote the will and mailed it to her on May 21, 1964. She went alone to his office on May 26, 1964, and signed her last will in the presence of two disinterested witnesses. Almost two months had elapsed between her first conference with Shell and the actual execution of the will.
There is not one iota of testimony in this voluminous record that Clarence Holland even knew of this will, much less that he participated in the preparation or execution of it. The evidence is all to the contrary. The evidence is undisputed that she executed her last will after the fullest deliberation, with full knowledge of what she was doing, and with the independent consent and advice of an experienced and competent attorney whose sole purpose was to advise with her and prepare her will exactly as she wanted it.
In January 1967, about one month before her death and some two years and eight months after she had made her will, she called W.R. Patterson, an experienced, reliable and honorable attorney who was a friend of hers, and asked him to come by her home for a few minutes. Patterson testified:
"She said, `Well, the reason I called you out here is that I've got an envelope here with all of my important papers in it, and that includes my last will and testament,' and says, `I would like to leave them with you if you've got a place to lock them up in your desk somewhere there in your office.'
"* * * [A]nd she said, `Now, Dan Shell drew my will for me two or three years ago,' and she says, `It's exactly like I want it,' and says, `I had to go to his office two or three times to get it the way I wanted it, but this is the way I want it, and if anything happens to me I want you to take all these papers and give them to Dan,' and she says, `He'll know what to do with them.'" (Emphasis added).
What else could she have done? She met all the tests that this Court and other courts have carefully outlined and delineated. The majority opinion says that this still was not enough, that there were "suspicious circumstances" and "antecedent agencies", but even these were not connected in any shape, form or fashion with the preparation or execution of her will. They had to do with her love life and her drinking habits and propensities.
It would appear that the new procedure will be to fine-tooth comb all the events of a person's life and if, in the mind of the judge on the bench at that particular time, there are any "suspicious circumstances" or "antecedent agencies" in that person's life even though they are in nowise connected with the preparation or execution of that person's will, such last will and testament will be set aside and held for naught. With all time-honored tests out the window, the trial judge will be in the dangerous predicament of embarking on an unknown sea, without chart or compass.
If full knowledge, deliberate and voluntary action, and independent consent and advice have not been proved in this case, then they just cannot be proved. We should be bound by the uncontradicted testimony in the record; we should not go completely outside the record and guess, speculate and surmise as to what happened.
I think that the judgment of the lower court should be reversed and the last will and testament of Fannie T. Moses executed on May 26, 1964, admitted to probate in solemn form.
BRADY, PATTERSON and INZER, JJ., join in this dissent.